# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Guerrero*, 2011 IL App (2d) 090972

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GUILLERMO S. GUERRERO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2–09–0972 |
| Filed | May 18, 2011 |
| Rehearing den. | July 13, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for aggravated criminal sexual abuse and criminal sexual assault of his daughter, appellate court rejected defendant's contentions that his counsel was ineffective in advising him that he was eligible for probation, that he was deprived of due process when the trial court informed him he was eligible for probation, and that evidence was insufficient to sustain his convictions, except on one count of criminal sexual assault, since defense counsel's performance was deficient, but under prejudice prong of *Strickland*, there was no reasonable probability for finding that outcome would have been different, but for deficient representation, defendant's plea of not guilty relieved the trial court of its obligation to ensure that defendant was fully admonished of potential penalties before proceeding to trial, and evidence, viewed in light most favorable to prosecution, was sufficient to establish defendant's guilt beyond reasonable doubt of all counts, except count alleging criminal sexual assault based on sexual penetration by cotton swab; therefore, that conviction was reversed and defendant's sentence was modified by subtracting four-year sentence imposed for that count. |

| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 07–CF–1778; the Hon. Philip L. DiMarzio, Judge, presiding. |
| --- | --- |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | Shannon M. Lynch, of Law Office of Shannon M. Lynch, of Oak Park, for appellant. |
| | John A. Barsanti, State's Attorney, of St. Charles (Lawrence M. Bauer and Barry W. Jacobs, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justices Bowman and Burke concurred in the judgment and opinion. |

## OPINION

¶ 1 Following a bench trial, defendant, Guillermo S. Guerrero, was found guilty of five counts of criminal sexual assault (720 ILCS 5/12–13(a)(3) (West 2006)) and two counts of aggravated criminal sexual abuse (720 ILCS 5/12–16(d) (West 2006)). He was sentenced to 22 years' imprisonment. The court subsequently modified the sentence to 19 years' imprisonment and denied defendant's posttrial motions. Defendant appeals, arguing that: (1) his trial counsel was ineffective where counsel erroneously informed him that he was eligible for probation and failed to correctly advise him that imprisonment was mandatory upon conviction; (2) he was deprived of due process where the trial court erroneously informed him at arraignment that he was eligible for probation; (3) the evidence was insufficient to sustain his convictions of criminal sexual assault and criminal sexual abuse; and (4) alternatively, the evidence concerning a sexual penetration by a cotton swab was insufficient to sustain defendant's conviction on that count (count V) of criminal sexual assault. For the following reasons, we affirm in part, reverse in part, and modify defendant's sentence to 15 years' imprisonment.

¶ 2                                          I. BACKGROUND

¶ 3                                    A. Pretrial Proceedings

¶ 4        On June 29, 2007, a grand jury returned a seven-count indictment, charging defendant
with five counts of criminal sexual assault, a Class 1 felony (720 ILCS 5/12–13(b)(1) (West
2006)). In counts I and II, the indictment alleged that, between October 1 and October 31,
2006, defendant committed an act of sexual penetration with I.G., his daughter (who was
under age 18), by putting his finger into her sex organ. Counts III and IV alleged that
defendant put his penis into I.G.'s sex organ, and count V alleged that he put an object, *i.e.*,
a cotton swab, into I.G.'s sex organ. The indictment also charged defendant with two counts
of criminal sexual abuse, a Class 2 felony (720 ILCS 5/12–16(g) (West 2006)). Specifically,
counts VI and VII alleged that defendant knowingly touched I.G.'s sex organ with his hand
for the purpose of sexual arousal or gratification, where I.G. was at least age 13 and under
age 17; additionally, count VI alleged that defendant was at least five years older than I.G.

¶ 5        Judge Philip L. DiMarzio arraigned defendant on August 2, 2007.[1] Eduardo Gil appeared
as defendant's counsel. As to the Class 1 felonies, the court informed defendant that the
sentencing range was 4 to 15 years' imprisonment, in addition to a period of mandatory
supervised release (2 years to life). The court also noted the possibility of a fine of up to
$25,000 and that, "You could be placed on probation for up to 48 months." (In fact,
probation is not an authorized disposition for a criminal sexual assault conviction; rather, a
term of imprisonment is mandatory. 730 ILCS 5/5–5–3(c)(2)(H) (West 2006).) As to the
Class 2 felonies, the court noted that the sentencing range was three to seven years'
imprisonment, in addition to two years of mandatory supervised release and the possibility
of a fine of up to $25,000. The court also noted that the sentences would run consecutively.
Defendant pleaded not guilty, and the matter was continued for discovery.

¶ 6        At a status hearing on October 24, 2007, before Judge Grant Wegner, Gil informed the
court that he had received discovery and that "we're making an application for a sex offender
evaluation." The matter was continued for, *inter alia*, return of the evaluation.[2]

¶ 7        At a hearing on December 19, 2007, before Judge DiMarzio, John Carroll appeared as
additional counsel for defendant. Gil was not present. Upon Carroll's request, the court set
a trial date.[3]

_____

[1]An interpreter was present to interpret the proceedings for defendant.

[2]No such evaluation is contained in the record on appeal.

[3]Also, an appearance form was filed by Michelle Gonzalez, but she never appeared before

the court on defendant's behalf.

¶ 8                                    B. Trial

¶ 9        On March 17, 2008, defendant appeared before Judge DiMarzio with attorney Carroll, who informed the court that defendant would waive his right to a jury so long as Judge DiMarzio would hear the case that morning. DiMarzio informed the parties that he could hear the bench trial that day, but would not be available for sentencing if defendant were convicted. Defendant was admonished only as to his right to a jury trial and waived a jury.[4]

¶ 10       The State first called I.G., age 15. I.G. currently resided in New Jersey with her biological mother, Caridad Matamoros, whom she met for the first time since infancy when she was 14 years old. She had lived with her mother for the past year or two. Defendant and Matamoros divorced when I.G. was an infant. I.G. lived in Mexico with her aunt, Marcella Guerrero (defendant's sister), and her grandmother, Irene Guerrero, until age seven. Defendant visited I.G. in Mexico two or three times per year. When I.G. turned seven, defendant told her that he wanted her to live with him and his current wife, Melesia Guerrero, and their two children. I.G. moved to Aurora and lived with defendant and Melesia and their son (age eight) and daughter (nine) for four or five years.

¶ 11       In March 2006, when I.G. was 14, defendant took I.G. to live with her mother because I.G. and defendant did not get along. I.G. resided with her mother for six or seven months. She did not get along with her mother because she had not been raised by her. When Matamoros called defendant to tell him about the situation, I.G. told her that she should just send her back to live with him. In October 2006, I.G. moved back to Aurora to live with defendant and his family.

¶ 12       When I.G. arrived in Aurora, defendant was on a road trip, working on a flooring job. When he arrived home, he was upset because Matamoros had told him something "delicate"; specifically, defendant was upset because I.G. had a relationship with a man in New Jersey. "He was pretty mad, about it. He spoke to me, he told me that he couldn't believe it. That he was going to send me, you know, to get myself checked out. Because he wanted to see if I had no, no [*sic*] infections or nothing [*sic*] like that."

¶ 13       According to I.G., she was in the dining room with defendant. He then called her to come upstairs to his bedroom. Her siblings were in the living room, watching television. Melesia, I.G.'s stepmother, was at work. In the bedroom, defendant told I.G. that he wanted to check her and instructed her to remove her pants and underwear. His tone was "normal or kind of upset." I.G. told him that she was embarrassed and did not want to remove her clothes. Defendant repeated that he wanted to "check something," and I.G. complied because she did not want defendant to become aggressive. She pulled her clothing down to her knees.

¶ 14       Defendant pushed I.G. down on the bed and spread open her legs. He began to "check" her by touching I.G.'s vagina with his finger. He complained that I.G. was not "getting wet," and I.G. stated that she wanted to go downstairs to complete making breakfast. Defendant

---

[4]There was no mention of potential penalties.

objected, stating that he wanted to finish. He continued touching I.G. and stated that it was "impossible, I don't know why you're not getting wet" and that he gets "wet" when he sees "something like this." Defendant then twice inserted his finger into I.G.'s vagina. After this, defendant "showed me how, how easy, you see, like [*sic*] I'm getting wet. He took out his penis and he like penetrated me." I.G. was able to see defendant's penis after defendant pulled down his jeans and boxer shorts. However, she was unable to describe it. Defendant showed I.G. that his penis was erect and wet and stated that he wanted to try something. At this point, I.G. "tried to stop it," but defendant penetrated I.G.'s vagina with his penis. Defendant then ejaculated on I.G.'s pubic hair.

¶ 15   Next, defendant picked up a Q-tip. I.G. could not recall from where defendant retrieved it. "He said he wanted to see what contact I had with the sperm, he got some liquid for [*sic*] me and then sperm of [*sic*] him, and he said he was going to take it to the laboratory to analyze it." As to the vaginal liquid, I.G. initially testified that defendant swabbed it from "my" vagina and later clarified that he swabbed it from "around" her vagina. As to the sperm, I.G. initially testified that defendant swabbed sperm from "inside" her vagina, but later testified that the sperm was on top of her. Defendant told I.G. that he was going to send the Q-tip to a laboratory to check how her body reacted to the sperm. He then instructed I.G. to take a shower "really good [*sic*], and to wash myself good [*sic*]." I.G. showered, finished serving breakfast to defendant and her siblings, and went to her bedroom because she felt "really dirty" and upset. That evening, Melesia returned from work. I.G. did not tell Melesia about the assault. Defendant never again mentioned the incident and never told I.G. not to tell anyone about what happened.

¶ 16   I.G. stayed at defendant's residence for two weeks. Defendant was "acting normal." On Halloween, I.G. skipped school, which was a half-day session. It was late, and she had a friend call defendant, who was "pretty mad." Defendant stated that the police were looking for I.G. (I.G. did not believe this) and that, when I.G. returned home, they would have a "serious talk." I.G. was scared and stayed at a friend's house. She told her friend and her friend's mother about the assault. I.G. stayed with her friend for two days and then went to her aunt Marcella's house in Aurora. (Marcella had moved to Aurora from Mexico.) I.G. explained that she did not immediately report the incident because she was scared of being hurt again and was waiting for the right moment.

¶ 17   On cross-examination, I.G. testified that, when she first lived in defendant's residence after moving from Mexico, defendant's wife, Melesia, was nice to her. However, once I.G. began having problems at school (*e.g.*, she skipped school), there was tension in the home. When asked if she loved her stepmother, I.G. replied "Not really" and "I can't say much." She did not know if Melesia loved her. During the tense period, I.G. never went to live with Marcella. Defendant and Melesia provided I.G. a place to live, food, and clothing. Prior to the October 2006 assault, defendant had never sexually assaulted her. However, he did slap I.G. as punishment.

¶ 18   Due to the dynamics in defendant's home, I.G. moved to New Jersey to live with her mother. In New Jersey, I.G. began to have problems with her mother. Her mother did not

want I.G. to have as friends a particular group her mother suspected was a gang. Also, I.G. had a sexual relationship with a man that lasted three or four months. I.G. denied that she had several relationships. I.G.'s mother called defendant to tell him that he had to take back I.G.

¶ 19 Addressing the assault, I.G. testified that, when defendant arrived home, she opened the door for him because he did not have his keys. Defendant told I.G. that he "needed to talk to me seriously." I.G. had been back home from New Jersey one or two days. Defendant spoke to her in the living room, and I.G. asked if she had done something "bad." After I.G. took a shower, she went downstairs to the kitchen and finished serving breakfast to defendant and her siblings. She had been gone from the kitchen for about 30 minutes. After breakfast, defendant watched television in the living room.

¶ 20 I.G. further testified that she had attended sex education classes and was aware how a woman becomes pregnant and of the possibility of infection from sexual partners. I.G. did not believe that she was pregnant, because, she explained, defendant did not ejaculate inside of her. I.G. was aware that one can call 911 in case of emergency. I.G. never called 911 or the school nurse to report the incident with defendant. The incident occurred on a Saturday. On Monday, I.G. went to school. She had an English teacher whom she liked and with whom she had a good relationship. However, I.G. did not tell her teacher about the assault.

¶ 21 About one week after the incident, I.G. had skipped a half-day of school on Halloween and learned that defendant was coming to pick her up and would be angry if she was not at school. I.G. had skipped school before and knew that defendant became angry when she did so. Her friend, Luce, called defendant. Luce told I.G. that defendant was mad and had called the police to report I.G. missing. I.G. went to another friend's house. I.G. told Luce about the assault. I.G. then stayed at Luce's house with Luce and her mother and spoke to them about the incident. There, she also spoke to a counselor. Two days later, I.G. went to Marcella's house and told her aunt about the assault. She knew that her aunt would not be mad at her.

¶ 22 On redirect examination, I.G. testified that it was defendant's idea that I.G. go to New Jersey to live with her mother. I.G. did not tell Melesia about the assault, because she would not believe it; I.G. did not get along with her stepmother. She did not tell her English teacher, because she was not ready to speak up and needed more time. I.G. never contacted the police; they came to her aunt's house.

¶ 23 According to I.G., defendant would not slap her, but hit her with different objects that left marks. About one year before the assault, a police report stated that I.G. had a bruise on her face that was caused by defendant when he slapped her.

¶ 24 After I.G. stayed with Luce for a few days, she went to live with Marcella. She stayed for six to eight months and then left because her aunt had young children, and I.G. did not want them involved in her problems. I.G. had contact with her aunt for a few months after, but stopped seeing her because defendant became angry about it. I.G. went to live with her mother.

¶ 25      On re-cross-examination, I.G. testified that, on the day of the incident, after Melesia came home, I.G. did not tell Melesia about the assault and did not ask her to go upstairs and look at the Q-tip. I.G. conceded that she left Marcella's house, Matamoros's house, and defendant's house because she had problems with the people living at each house.

¶ 26      Marcella Guerrero, age 35 and defendant's sister, testified through an interpreter as follows. Marcella moved with her family to Aurora from Mexico about seven years ago (about one year after I.G. moved there to live with defendant). I.G. lived with Marcella in Mexico from the time I.G. was nine months old to age eight. After she first moved to Aurora, Marcella would see I.G. every week. As time passed, she would see her less often because defendant would not let her see I.G. Marcella loves I.G. and wants only the best for her. About 1 1/2 years ago (*i.e.*, late 2006), Marcella was at defendant's house. Also present were I.G., defendant, and Melesia (defendant's wife). Marcella observed defendant hit I.G. in the face. He stated that I.G. "was a nobody, that she was a, a bitch, or why did she have pictures of men." This was the only time Marcella observed defendant hit I.G. She did, though, observe bruises on I.G.'s arm when I.G. was 12 or 13 years old. During the incident when defendant slapped I.G., Marcella had been invited to defendant's home by Melesia, who was afraid that defendant was going to be mad about the photograph and hit I.G.

¶ 27      Juan DeJesus, a child abuse investigator at the Department of Children and Family Services (DCFS) child advocacy center, testified that, in November 2006, he investigated a case involving a victim named I.G. He explained that, when a new report comes in, it is assigned a sequential letter. When investigating a case, DeJesus reviews prior sequenced reports. In I.G.'s case, there was a prior incident reported on October 18, 2005, as an allegation of physical abuse; a different investigator investigated the report. Defendant had slapped I.G. in the face, and she had a mark on her cheek. The report was "indicated," meaning that, in the investigator's opinion, there was substantial evidence to support the allegation. I.G. was not removed from the home, and no charges were brought against defendant.

¶ 28      The State rested. The trial court denied defendant's motion for a directed finding.

¶ 29      Melesia Guerrero, defendant's wife, testified on defendant's behalf through an interpreter that she had been married to defendant for 12 years. Ever since I.G. arrived to live in their home, she was problematic. Melesia knew she had to accept I.G. as defendant's daughter and guide her on a good path. I.G. was in counseling for 1 1/2 years. She could not relate well to the younger children in the home. I.G. did not respect defendant's rules. She had problems in grammar school. Once, I.G. threw a Vaseline bottle, trying to hit a teacher. When I.G. moved to New Jersey, there was less tension in the house.

¶ 30      Melesia had never observed defendant do anything sexually inappropriate with I.G. However, she had observed defendant spank and slap I.G. Addressing the timing of the alleged assault, Melesia testified that she worked six days a week at the time and had Sundays off from work. The incident allegedly occurred at 9 a.m. on a Saturday. However, Melesia worked from 4 to 8 p.m. on Saturdays.

¶ 31    According to Melesia, I.G. lied and would say things to her aunts that were untrue "to have us be [*sic*] one against the other so that we would be fighting between us [*sic*]." Marcella would try to visit I.G. "just to give her bad advices [*sic*] only. And to always pit her against [defendant]." Melesia and defendant decided to stop letting I.G. see Marcella.

¶ 32    Due to the problems they were having, Melesia put I.G. in counseling at Mutual Ground in Aurora. Also, she asked Marcella for help, but Marcella accused Melesia of not loving I.G. Melesia stated that she loved I.G. like a daughter.

¶ 33    Defendant testified through an interpreter as follows. He denied that he inserted his finger or penis into I.G.'s vagina. He also denied taking a Q-tip and playing doctor with I.G.

¶ 34    Defendant testified that I.G. had problems in defendant's home and at school. When I.G. went to live in New Jersey, the situation in defendant's home improved. I.G. called and asked to come back because she was out on the street. Her mother had thrown her out of the house because she found her in bed with a boy. After I.G. returned to Aurora, she behaved for a short time.

¶ 35    One of defendant's rules was that I.G. was supposed to go to school. She was also supposed to do her homework and clean her room. On a particular day in October 2006, defendant went to school to pick up I.G., but she was not there. He called the police to report her missing. When defendant was accused, he gave permission to have I.G. stay with Marcella because, otherwise, she would have been placed in a shelter. DCFS did not remove I.G. Defendant answered police questions without an attorney and told the police that I.G.'s allegations were false.

¶ 36    On cross-examination, defendant testified that he brought I.G. to the United States because she had problems with his parents, the same kinds of problems she had with others. He wanted her to meet her brother and sister; also, I.G. was born in the United States and defendant wanted her to be raised in this country and to learn English. When I.G. first arrived, she did not speak English. Defendant allowed I.G. to have friends who were boys, but she took it to mean boyfriends. He became very mad when he found a picture of a boy in her purse. Defendant slapped her because she lied to him.

¶ 37    Matamoros called defendant and told him that she found I.G. in bed with a boy. When I.G. returned from New Jersey, defendant was in Texas. When he returned to Aurora, he sat down with I.G. and Melesia and discussed the problem. Defendant was angry with I.G. and had not known she was having sex with boys. It made him feel bad because she was not raised that way. Defendant did not hit or punish I.G. when he found out. Defendant had no other conversation with I.G. and let Melesia speak to I.G. to see if they could work things out.

¶ 38    Defendant's house was peaceful when I.G. was not living there. It made defendant feel bad because I.G. is his daughter. Defendant urged I.G. to go live with her mother "for her good, to see if she would change a little bit. But she didn't. And she wanted to hit her mother."

¶ 39        C. Verdict and Posttrial Proceedings up to Second Posttrial Motion

¶ 40        The trial court announced its judgment on March 18, 2008, finding defendant guilty on all counts. The court first noted several weaknesses in the State's case, including that there was no prompt outcry by I.G. or physical corroboration; that Melesia was not at work at the time alleged by I.G.; and that I.G. completed the preparation of breakfast immediately after the assault. The court also noted that I.G. apparently did not tell police that defendant told her to take a shower. However, the court found I.G. "highly" credible, noting that her "account rang true in every significant aspect." I.G. detailed her father's actions, including how his anger turned to lust and how his examination turned into a sexual penetration. Although he did not threaten I.G., he did order her to take a shower, which destroyed the physical evidence. The court further noted that it "defie[d] belief" that a 14-year-old girl could make up such a detailed and coherent account of the events, specifically noting that I.G.'s account was "devoid of embellishment" and that her manner was "convincing." The court also found that I.G.'s "pain was evidenced in her face, and in her tone." The court was "convinced of her truthfulness." As to Melesia, the court found that the fact that she was away someplace other than work did not render I.G.'s testimony incredible and that any impeachment was "tangential."

¶ 41        Addressing I.G.'s failure to report the assault, the court found that, on the occasion when defendant bruised I.G., nothing was done following the indicated report and that this would not have promoted I.G.'s "confidence in the system." Also, the court noted the hostility between Melesia and I.G. and the lack of trust.

¶ 42        Addressing defendant's credibility, the court found him incredible, specifically finding unbelievable defendant's testimony that he did not address the issue of I.G. having been caught in bed with a boy when he had a much stronger reaction to I.G. having only a photograph of a boy. The court noted that this was out of character with defendant's "hands-on" approach to disciplining his daughter.

¶ 43        Next, Judge DiMarzio noted his impending retirement and reminded the parties that he would not preside over the sentencing hearing or any posttrial motions. Nevertheless, he made some remarks concerning sentencing "for whatever they may be worth." Specifically, Judge DiMarzio noted that he "would not rule out and I would consider probation in this case, with jail time and mandatory counseling." He based this view on the fact that defendant's assault was an isolated act "in the throes of emotion" by a man who had led a productive, law-abiding life and whose children depended on him.

¶ 44        Defendant's counsel inquired whether, if defendant waived the presentence investigation, the court could impose a sentence. The court denied this request, noting that the investigation could not be waived without a plea agreement. Also, the court emphasized that it would not necessarily sentence defendant to probation, but would consider it.

¶ 45        On May 2, 2008, before Judge Robert B. Spence, the case came up for sentencing and a hearing on the posttrial motions. In his first posttrial motion, defendant asserted error as

-9-

to the sufficiency of the evidence, the court's evidentiary rulings, and the court's denial of his motion for a directed finding. The court denied defendant's first posttrial motion.

¶ 46 Next, the case proceeded to a sentencing hearing. Attorney Carroll inquired if Judge Spence had reviewed Judge DiMarzio's decision; the court replied in the affirmative. The State commenced its argument and noted that imprisonment was mandatory on the criminal sexual assault convictions, which were Class 1 felonies with a sentencing range of 4 to 15 years on each count due to the nature of the charges, *i.e.*, defendant was a family member of the victim. Further, the State noted that probation was previously permitted under the law, but not since 2003. The State also noted that all the sentences would run consecutively. The State conceded only that counts III and IV (involving defendant's sex organ) would merge. Finally, the State urged that the minimum total sentence would be 22 years and it requested more than the minimum sentence.

¶ 47 Attorney Carroll disagreed with the State's position that the counts did not all merge into one assault and disagreed that probation was not available. Carroll noted Judge DiMarzio's statement that he would consider probation and asked the court to consider probation. In reply, the State noted that the presentence report stated that defendant had no criminal history but that defendant was not eligible for probation and, so, no probation recommendations were made.

¶ 48 Judge Spence merged counts III and IV and sentenced defendant to consecutive four-year terms of imprisonment on counts I, II, the merged counts III and IV, and V. He also sentenced defendant to three years' imprisonment on counts VI and VII, to run consecutively to each other as well as to counts I through V. The cumulative sentence was 22 years. Attorney Carroll inquired what year the law was changed to eliminate the possibility of probation, and the State replied that the law changed in 2004.

¶ 49 On May 21, 2008, attorney Carroll moved to vacate the convictions and sentence. No notice was attached to the motion, and there is no transcript of any hearing on the motion.

¶ 50 On October 24, 2008, attorney Shannon Lynch filed an appearance for defendant, requesting additional time to meet with his client and prepare additional posttrial motions.

¶ 51 D. Second Posttrial Motion and Motion to Reconsider Sentence

¶ 52 On January 22, 2009, defendant, through attorney Lynch, filed a second motion for a new trial and moved to reconsider the sentence. In his second motion for a new trial, defendant argued that he was denied due process when Judge DiMarzio misinformed him at arraignment of the possibility of probation as a sentence for the charged offenses. He also argued that he was denied effective assistance of trial counsel, where counsel was unaware that the sentences for the charged offenses were mandatory consecutive terms of imprisonment. Defendant asserted that, had he been aware that probation was not an option, he would have negotiated for a lesser sentence. He alleged that he decided to forgo negotiations because of the possibility of probation and his lack of criminal background and

other mitigating factors. He also challenged the sufficiency of the evidence.

¶ 53    On July 2, 2009, a hearing before Judge Jordan Gallagher was held on defendant's second posttrial motion. Defendant testified through an interpreter that, at arraignment, he was informed by Judge DiMarzio that he was eligible for probation. Attorney Gil represented defendant at that time. Gil never informed defendant that probation was not an option. After Attorney Carroll took over defendant's case, he told defendant (at defendant's home about three months before trial) that he was eligible for probation. Carroll also told defendant that they were going to trial and that defendant "could still get probation" because defendant did not have a criminal background. According to defendant, he first learned that he was not eligible for probation at the sentencing hearing. No one informed defendant prior to sentencing that the minimum sentence he could receive if he were convicted on all counts was over 20 years' imprisonment. Defendant testified that, if he had been informed of this, he would have sought negotiations with the State. His wife and children need him.

¶ 54    On cross-examination, defendant stated that Gil, with whom he met twice, never discussed with him the possibility of negotiating with the State. Instead, Gil stated that defendant had to undergo certain testing. Defendant was willing to undergo DNA and other testing. They never discussed any trial, and Gil never discussed with defendant interviewing witnesses and conducting discovery.

¶ 55    The State called Gil, who testified that he represented defendant for about six months. He met with defendant several times and was present when defendant was arraigned. They had conversations about the charges, most likely at Gil's office, but Gil could not recall the specific date or who was present. Gil did review the charges with defendant and stated that it would have been his normal procedure to review the charges and penalties with his client at the initial meeting, but he had no independent recollection of his meeting with defendant or going over the fact that the charges were nonprobationable. There were no negotiations conducted with the State. The only contact with the State was in the context of discovery, such as obtaining police reports. According to Gil, defendant did not indicate that he wanted to negotiate. Defendant was "adamant" about his innocence and wanted Gil's office to conduct extensive discovery, including going to the East Coast to obtain certain information. At that point, Gil determined that his office did not have the resources to continue representing defendant and he referred defendant to another attorney.

¶ 56    On August 14, 2009, Judge Gallagher denied defendant's second posttrial motion. Also, the court granted defendant's motion to reconsider the sentence, finding that counts VI and VII should be concurrent with each other and consecutive to counts I through V. Defendant's cumulative sentence was reduced to 19 years' imprisonment. Defendant appeals.

¶ 57                                   II. ANALYSIS

¶ 58                            A. Ineffective Assistance Claim

¶ 59    Defendant argues first that he was denied effective assistance of counsel where attorney

Carroll incorrectly advised him that he was eligible for probation and advised him that his lack of criminal background would likely result in a probation sentence after any conviction. Defendant contends that he relied on counsel's advice to forgo plea negotiations and, accordingly, proceeded to trial. He requests that we vacate the convictions and remand the cause for a new trial or plea negotiations. For the following reasons, we reject defendant's argument.

¶ 60 A defendant has a sixth amendment right to effective assistance of counsel. *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). We review claims of ineffective assistance of counsel according to the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), which requires a defendant to show both that: (1) as determined by prevailing professional norms, counsel's performance fell below an objective standard of reasonableness (deficient-performance prong); and (2) the defendant was prejudiced by counsel's deficient performance (prejudice prong). The defendant must satisfy both prongs to prevail on a claim of ineffective assistance of counsel, but a reviewing court may analyze the facts under either prong first, and if it deems that the standard for that prong is not satisfied, it need not consider the other prong. *People v. Irvine*, 379 Ill. App. 3d 116, 129-30 (2008). To satisfy the deficient-performance prong, the defendant must show that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the sixth amendment. *People v. Thompson*, 359 Ill. App. 3d 947, 952 (2005). To prove prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *People v. Haynes*, 192 Ill. 2d 437, 473 (2000). A reasonable probability is one that sufficiently undermines confidence in the outcome. *People v. King*, 316 Ill. App. 3d 901, 913 (2000).

¶ 61 We focus our analysis of this issue on the prejudice prong. However, we first briefly address counsel's deficient performance, which the State essentially concedes on appeal. An illustrative case is *People v. Curry*, 178 Ill. 2d 509 (1997), where, unlike here, the accused engaged in plea negotiations with the State. Before addressing *Curry*, we note that a defendant does not have a constitutional right to a plea bargain, but if the State chooses to bargain, then the defendant has a right to effective assistance of counsel during those negotiations. *Id.* at 518. As part of a defendant's right to effective assistance of counsel during plea negotiations, a defendant has a right to be reasonably informed with respect to the direct consequences of accepting or rejecting a plea offer. *Id.* at 528. Further, defense counsel has an obligation, in this context, to inform his or her client of the maximum and minimum sentences that can be imposed for the offense(s) with which the defendant is charged. *Id.* Finally, the right to effective assistance of counsel extends to the defendant's decision to reject a plea offer, even if the defendant subsequently receives a fair trial. *Id.* at 530.

¶ 62 In *Curry*, the defendant was charged with two counts of criminal sexual assault and one count of residential burglary. The parties entered into negotiations, and the State offered to dismiss the residential burglary charge and one of the criminal sexual assault charges and recommend a sentence of 4 1/2 years' imprisonment if the defendant agreed to plead guilty

to the remaining count of criminal sexual assault. Defense counsel was unaware that consecutive sentencing was mandatory and informed the defendant that, if he were convicted of any of the three charges, he would receive a sentence close to four years' imprisonment. Based on this information, the defendant rejected the plea offer and proceeded to trial, whereupon he was convicted of all three counts and sentenced to a 12-year prison term (*i.e.*, three mandatorily consecutive four-year prison terms). Specifically, with respect to the deficient-performance prong, the court held that counsel's advice to reject the State's plea offer was not a tactical decision, but was predicated on a misunderstanding of sentencing law and, thus, objectively unreasonable and outside the range of reasonable professional assistance. *Id.* at 529. Addressing the prejudice prong, the court held that the defendant showed that there was a reasonable probability that, absent counsel's deficient advice, he would have accepted the plea offer. The court held that the record, which included counsel's affidavit admitting his erroneous advice and reflecting the defendant's reliance upon it, supported the defendant's contention that, but for counsel's erroneous advice, he would have accepted the State's offer, and it found counsel ineffective. *Id.* at 536. The court remanded the cause for a new trial with the possible resumption of plea bargaining. *Id.*

¶ 63    Here, as previously noted, the State essentially concedes that *Strickland*'s deficient-performance prong is met. We agree that trial counsel's performance was objectively unreasonable under prevailing professional norms. At the sentencing hearing, Carroll disagreed with the State's argument that probation was not available and asked the court to consider probation. After the court announced sentence, Carroll inquired as to what year the law was changed to eliminate the possibility of probation. Defendant testified at the hearing on his second posttrial motion that Carroll told him at a meeting at defendant's home that he was eligible for probation; that they were going to trial; and that probation would still be a possible sentence after trial due to defendant's lack of criminal background. Defendant further testified that he first learned that he was not eligible for probation at the sentencing hearing and that, if he had known this, he would have negotiated with the State. (Attorney Gil could not recall if he informed defendant that the sentences were nonprobationable; he testified only as to his typical procedure and had no independent recollection of his meeting with defendant.) Further, Carroll was unaware that the sexual assault sentences would run consecutively; he disagreed with the State that the charges would not all merge into one assault. Based on this record, counsel's performance was clearly deficient. See *id.* at 529 (representation falls outside the range of reasonable professional assistance where counsel's advice is predicated on a misunderstanding of sentencing law).

¶ 64    Turning to *Strickland*'s prejudice prong, defendant suggests that *People v. Brown*, 309 Ill. App. 3d 599 (1999), is instructive. In *Brown*, the defendant received a sentence of natural life imprisonment for an aggravated-battery-with-a-firearm conviction and four weapons offenses. He argued on appeal that he received ineffective assistance of counsel during plea negotiations. During negotiations, the State had offered the defendant an aggregate 18-year sentence in exchange for guilty pleas on the aggravated-battery-with-a-firearm count and a lesser count. The defendant rejected that offer, as well as a subsequent 15-year offer, and was subsequently convicted by a jury of all five counts. At sentencing, the defendant first

learned that he would be sentenced to life imprisonment as an habitual offender due to two prior Class X convictions. He argued on appeal that he received ineffective assistance of counsel because his trial attorney never informed him that he would receive a mandatory life sentence if he were convicted of aggravated battery with a firearm. Specifically, he alleged that he was prejudiced by counsel's failure to inform him of his exposure to a life sentence if he rejected the plea offers and went to trial. The appellate court first held that defense counsel's performance was deficient in that counsel failed to accurately inform the defendant that he would receive a life sentence if he were convicted of aggravated battery with a firearm and, as a result, counsel did not fulfill his duty to accurately inform the defendant of the direct consequences of accepting or rejecting the State's offers. *Id.* at 605.

¶ 65    Addressing prejudice, the court noted that neither party to the plea negotiations was aware that a conviction of aggravated battery with a firearm carried, in that case, a mandatory life sentence. *Id.* at 606. Also, the court noted that the State never offered to dismiss or reduce this charge and that, as a result, had defendant accepted either of the State's offers, the trial court could not have approved the agreement, because it would have required an unauthorized sentence. *Id.* This distinguished the case from *Curry*, in the court's view, because, had the *Curry* defendant accepted the State's offer, he would not have been subject to mandatory consecutive sentences. *Id.* The court continued:

> "Even so, we do not believe that this factual distinction is legally consequential. The question of whether a defendant has suffered prejudice should not turn on whether the State has unwittingly failed to propose an authorized sentence during tainted plea negotiations. It would be absurd to conclude that a defendant's right to the effective assistance of counsel should depend upon such happenstance." *Id.*

The court held that, where neither party is aware that the defendant is subject to a mandatory sentence, "defense counsel's ignorance is sufficient to undermine confidence in the outcome of the negotiations." *Id.* The court noted that, if defense counsel had been aware of the sentence, he could have negotiated for dismissal or reduction of the aggravated-battery-with-a-firearm charge. *Id.* The court acknowledged that it was not possible to say whether the State would have agreed to the proposal, because such responses are always conjectural. *Id.* Accordingly, the court concluded that the defendant did not receive effective assistance of counsel and it reversed and remanded the cause for resumption of plea negotiations and, if necessary, a new trial. *Id.* at 607.

¶ 66    Here, defendant argues that, based on counsel's advice, he chose to go forward with a trial as opposed to negotiating with the State. He urges that he followed counsel's advice, specifically noting that counsel always told him that they were going to trial and that, even if convicted after trial, he would likely receive a probation sentence. Defendant testified that he first learned of the mandatory consecutive prison sentence at sentencing and that, if he had known that the minimum sentence (if convicted on all counts) was in excess of 20 years, he would have sought negotiations with the State. Defendant further notes that, although Gil did not recall their discussions, the record reflects that Gil informed the court at the October 24, 2007, court date that defendant was making an application for a sex offender evaluation,

which, defendant urges, suggests a willingness to negotiate.

¶ 67    Defendant further argues that the fact that the *Curry* defendant had actually been offered a deal by the State should not warrant a different result here. He notes that this case is similar to *Brown*, where the State tendered the defendant an invalid (and, thus, in defendant's view, nonexistent) offer. In other words, defendant argues that, in *Brown*, due to its illegality, there was in effect no offer for the defendant to accept and the court focused instead on counsel's failure to inform the defendant of the mandatory life sentence, which undermined confidence in the outcome. He argues that, here, as in *Brown*, defense counsel's ignorance is sufficient to undermine confidence in the outcome. We disagree.

¶ 68    First, there is no indication in *Curry* that the supreme court intended that its holding in that case also apply to cases, such as the present case, where no negotiations have been conducted. Nor do we read *Brown* to apply in cases where no negotiations were conducted. Again, a defendant does not have a constitutional right to a plea bargain. *Curry*, 178 Ill. 2d at 518. We reject defendant's argument that *Brown* represents a fact pattern like the present case because the State's offer in *Brown*, which was an unauthorized sentence, was, in effect, no offer. As distinct from the present case (where there were no plea negotiations), the issue in *Brown* was whether the defendant was able to make a knowing and intelligent decision concerning the State's plea offer. See also *People v. Church*, 334 Ill. App. 3d 607, 616-17 (2002) (distinguishing *Brown* on its facts and holding that the trial court did not abuse its discretion in finding that the defendant was not prejudiced by his defense counsel's failure during plea negotiations to advise him that truth-in-sentencing provisions applied and that, if the defendant pleaded guilty, he would have to serve 85% of his sentence; the defendant could not show prejudice by speculating that, had he known of the 85% rule, he could have negotiated a better deal).

¶ 69    We also reject defendant's argument that Gil's comment to the court on October 24, 2007, that defendant was making an application for a sex offender evaluation *necessarily* indicated a willingness to negotiate. Section 5–3–2 of the Unified Code of Corrections sets forth the general contents of presentence reports. 730 ILCS 5/5–3–2 (West 2006). Subsection (b–5) therein requires a sex offender evaluation as part of the presentence investigation only when a defendant is eligible for probation. 730 ILCS 5/5–3–2(b–5) (West 2006);[5] *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Therefore, contrary to defendant's reading, the fact that Gil was pursuing a sex offender evaluation does not necessarily indicate a willingness to negotiate, but, rather, may have reflected only his misunderstanding that

[5]Effective January 1, 2010, the statute provides that, in cases where the defendant "is being considered for any mandatory prison sentence, the investigation shall not include a sex offender evaluation." Pub. Act 96–322, § 5 (eff. Jan. 1, 2010) (amending 730 ILCS 5/5–3–2(b–5) (West 2008)).

defendant was eligible for probation.

¶ 70    Defendant argues next that, because of counsel's inadequate representation, he was unaware of the penalties he faced and was in no position to assess counsel's advice to proceed to trial and forgo negotiation attempts. Conceding that there is never a guarantee that such negotiations will be successful, defendant contends that, here, negotiations would have been advantageous to both sides. He asserts that the State's case was far from certain, pointing to the trial court's ultimate findings that there was no prompt outcry, there was no physical corroboration, and I.G. was impeached by certain facts, including whether Melesia was at work during the assault. The case, in defendant's view, came down to the credibility of the complaining witness alone, a troubled teen with a motive to fabricate. He suggests that the State would have attempted to resolve the matter via negotiations. From defendant's perspective, he argues that he would have negotiated because a trial would have revealed that he had motive and opportunity and that I.G.'s account contained details unlikely to have been invented. Further, he had no criminal background, had dependents who would be harmed by his absence, and had demonstrated that he could comply with court orders while he remained on bond. Defendant claims that he would have attempted to minimize the damage through negotiations and that the State, considering these factors, would have been willing to negotiate.

¶ 71    Again, we reject defendant's argument that he has presented sufficient evidence to undermine confidence in the outcome of this case. The record before us does not indicate that the State ever offered to negotiate with defendant.[6] Gil was not asked whether he sought negotiations with the State or whether the State made an offer. Further, Carroll did not testify at the hearing. We have before us only: (1) defendant's self-serving testimony that he would have sought negotiations with the State had he known that probation was not available (and his testimony that Gil never discussed with him the possibility of negotiations); and (2) Gil's testimony that there were no negotiations with the State and that defendant did not indicate that he desired to negotiate. On this record, therefore, we cannot evaluate whether, as to *Strickland*'s prejudice prong, if not for defense counsel's deficient representation, there is a reasonable probability that the outcome would have been different.

¶ 72    Defendant maintains that he should not be required to obtain testimony or an affidavit from Carroll, because defendant supported his claim with sworn testimony and because the record corroborates his version. We reject defendant's claim. He relies on *People v. Barkes*, 399 Ill. App. 3d 980, 992 (2010), a postconviction case, which held, as to the defendant's ineffective assistance claim, that the allegations in the defendant's petition, along with his affidavit, were sufficient to warrant an evidentiary hearing on the issue whether counsel was

_____

[6]However, we are troubled that at no time before sentencing did the State attempt to

correct the court's erroneous statements. Both at arraignment and at the conclusion of trial, the

State stood silent, allowing the court's erroneous statements to stand.

-16-

ineffective for failing to inform the defendant that he faced mandatory consecutive sentences upon conviction; the defendant also maintained that, had he been so informed, he would have accepted the State's offer of 25 years' imprisonment. *Id.* We find *Barkes* inapposite because it involved a second-stage postconviction petition and was not a direct appeal; therefore, the case determined only that the defendant should have an opportunity to show prejudice, not that the defendant actually was prejudiced.

¶ 73    In summary, we reject defendant's argument that he was denied effective assistance of counsel.

¶ 74                              B. Due Process Claim

¶ 75    Defendant argues next that he was denied due process where the trial court erroneously informed him at arraignment that he was eligible for probation. He claims that he relied on this misinformation to forgo plea negotiations and, instead, proceeded to trial. Defendant requests that we hold that, where the trial court takes it upon itself to inform a defendant of the potential penalties, due process requires, at a minimum, that the defendant be provided accurate information. For the following reasons, we reject defendant's argument.

¶ 76    Preliminarily, where a defendant has pleaded not guilty, the trial court has no obligation to inform the defendant of the possible sentences if he or she is convicted of the charged offenses. *People v. Harvey*, 366 Ill. App. 3d 910, 918 (2006); *People v. Perez*, 113 Ill. App. 3d 143, 150 (1983). Although defendant asserts an alleged constitutional right, we note that no statute or Illinois Supreme Court rule imposes any duty on the trial court to inform a defendant at arraignment of potential sentences. Section 113–1 of the Code of Criminal Procedure of 1963 (Code), which addresses the procedures on arraignment, provides that:

> "Before any person is tried for the commission of an offense he shall be called into open court, informed of the charges against him, and called upon to plead thereto. If the defendant so requests the formal charge shall be read to him before he is required to plead. An entry of the arraignment shall be made of record." 725 ILCS 5/113–1 (West 2006).

Section 113–4 of the Code, which addresses pleas, requires the court to advise a defendant of the maximum penalty for the offense only if the defendant pleads guilty. 725 ILCS 5/113–4(c) (West 2006). The statute that addresses pleas of not guilty states only that the court must advise the defendant concerning the consequences of escaping from custody, release on bond, and failure to appear in court. 725 ILCS 5/113–4(e) (West 2006). Finally, the Illinois Supreme Court rules require that the trial court admonish a defendant concerning the minimum and maximum sentences (including any penalties due to prior convictions or consecutive sentences) only if the defendant waives his or her right to counsel (Ill. S. Ct. R. 401(a)(2) (eff. July 1, 1984)) or enters a guilty plea or stipulates that the evidence is sufficient to convict (Ill. S. Ct. R. 402(a)(2) (eff. July 1, 1997)).

¶ 77    Here, however, defendant emphasizes that he is not arguing that the trial court was

obligated to inform him of the potential penalties before he opted for a trial. Rather, he contends that, when the trial court *voluntarily* attempted to instruct defendant on the potential penalties, due process required that the court *correctly* inform defendant as to the penalties. Defendant asserts that his constitutional rights were violated when he relied on the misinformation (which was compounded by defense counsel) and that his convictions must be vacated and the cause remanded for a new trial and the opportunity to negotiate with the State.

¶ 78     We conclude that, because the trial court had no obligation to inform defendant, who pleaded not guilty, of the possible penalties, defendant's claim fails. We agree with the State that a not-guilty-plea scenario, such as the present case, does not implicate the safeguards that a guilty-plea setting contains to ensure a defendant's knowing and intelligent waiver of his or her right to trial, because the exercise of a defendant's right to trial does not constitute a waiver of any of the constitutional rights attending trial. See, *e.g.*, *People v. Jones*, 174 Ill. App. 3d 794, 797-98 (1988) (entry of guilty plea involves the waiver of several constitutional rights, including the right against compulsory self-incrimination, to trial by jury, and to confront accusers; accordingly, due process requires an intelligent and voluntary plea). Thus, a trial court has no obligation to ensure that a defendant is fully admonished of the potential penalties before he or she proceeds to trial.

¶ 79     Alternatively, even if any obligation arose when the court took it upon itself to inform defendant of the penalties, defendant's claim still fails because the record shows no prejudice to him as a result of the court's misstatement. See *Harvey*, 366 Ill. App. 3d at 919 (even if court had obligation to inform defendant, improper admonishment in and of itself does not provide grounds for reversal; no reversal is required unless defendant has been denied real justice or has been prejudiced by the misstatement). Here, clearly, Judge DiMarzio erred in advising defendant at arraignment that he would be eligible for probation. However, as we noted above with respect to defendant's ineffective assistance claim, defendant cannot show on this record that the State ever indicated that it was willing to negotiate with defendant. We have only defendant's self-serving assertion that he would have negotiated if he had known that probation was not an option.

¶ 80     In summary, we conclude that defendant's due process claim fails.


¶ 81                              C. Sufficiency of the Evidence

¶ 82     Defendant argues next that he was not proved guilty beyond a reasonable doubt of all the charges. He contends that I.G.'s testimony was uncorroborated and inconsistent, and he requests that we reverse his convictions. For the following reasons, we reject defendant's argument.

¶ 83     In reviewing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jordan*, 218 Ill. 2d 255, 269 (2006). Our duty as a reviewing court is to carefully examine the evidence

while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004); *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 84     As relevant here, a person commits criminal sexual assault when he or she "commits an act of sexual penetration with a victim who was under 18 years of age when the act was committed and the accused was a family member." 720 ILCS 5/12–13(a)(3) (West 2006). An accused commits aggravated criminal sexual abuse "if he or she commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 17 years of age and the accused was at least 5 years older than the victim." 720 ILCS 5/12–16(d) (West 2006).

¶ 85     Defendant notes that the State's case rested on I.G.'s credibility and he argues that the trial court erred in finding her credible. First, he complains that I.G. failed to specify the date upon which the assault occurred. He notes that she stated that she returned to Aurora in October 2006, that the assault was on a Saturday, and that she reported the assault on Halloween. Defendant argues that, given the short time frame, it is "suspicious" that I.G. did not testify as to the particular day the assault took place. We reject defendant's claim. The details that I.G. provided were sufficient, in our view, to identify the day that the crimes took place. Specifically, she noted the day of the week and the fact that Halloween occurred about one or two weeks after the assault. Finally, as the State notes, where the statute of limitations is not at issue and the defendant has not asserted an alibi defense, a witness's failure to recall the specific date of the offense does not in itself raise reasonable doubt. See *People v. Letcher*, 386 Ill. App. 3d 327, 332 (2008).

¶ 86     Next, defendant argues that I.G. was inconsistent as to whether defendant walked with her upstairs to the bedroom or whether he called her upstairs. We conclude that, although the testimony was somewhat inconsistent, it did not render incredible I.G.'s version of the events. I.G. was asked, "when [defendant] said that he was going to have you checked out, what did he do then?" She responded: "He called me up to his room." Given that English was I.G.'s second language (and this is confirmed in the transcripts of her testimony), we cannot conclude that this response necessarily reflects that defendant was upstairs when he called her to his bedroom. Later, in response to a question asking where she was when defendant asked her to come up to the bedroom, I.G. replied: "We were in the downstairs in the, in the dining room." On cross-examination, I.G. testified that she and defendant were in the living room when defendant stated that he wanted to speak to her upstairs. Again, although the testimony was not very clear, we cannot conclude that it rendered unbelievable I.G.'s account of the assault.

¶ 87     Next, defendant contends that I.G.'s testimony lacked critical details, such as from where defendant obtained the Q-tip, a description of his penis, what occurred immediately after the assault (other than the shower and making breakfast), and what occurred in the days following the assault. Defendant also points to I.G.'s claim that Melesia was at work during the assault at a time when Melesia could not actually have been at work. We disagree that

-19-

the foregoing were critical details that rendered I.G.'s testimony incredible. As to the Q-tip and any description of defendant's penis, we do not believe that the absence of these details, which I.G. could have obtained only in the course of the assault, rendered her testimony incredible. Turning to the events immediately following the assault, we conclude that I.G.'s testimony that she showered and then returned downstairs to complete breakfast preparations was sufficiently detailed. As to the days following the assault, I.G. testified that she essentially went about her typical routine, such as school, and that she did not immediately report the assault. Given that she did not report the crimes until one week after they occurred, we fail to see how any additional details concerning the week during which she did not report the crimes were critical. Finally, as to I.G.'s testimony concerning Melesia's absence from the home during the assault, as the trial court noted, this conflicted with Melesia's testimony that she could not have been at work during those hours. Nevertheless, we believe that the trial court reasonably discounted this inconsistency and we note that Melesia did not testify that she actually *was* at home during this time.

¶ 88    Defendant next complains that I.G.'s actions were not consistent with having been sexually assaulted. He notes that she returned to make breakfast 30 minutes after the alleged assault; did not inform authorities, a trusted teacher, or her aunt; and made the accusation only upon learning she was in trouble for skipping school. Defendant asserts that I.G. had a motivation to lie to deflect her own misbehavior and portray herself as a victim. Defendant notes that he had no history of inappropriate sexual behavior, that he worked and cared for his family, and that he cooperated with police and answered their questions without an attorney. He also notes that he called the police to report I.G. missing.

¶ 89    We reject defendant's argument. The trial court heard the testimony and assessed witness credibility. As Judge DiMarzio noted, I.G. had previously reported defendant for slapping her, and the authorities took no actions in response. Given this lack of response, the court noted, I.G. would not have placed much "confidence in the system." The evidence supports this finding and explains I.G.'s delayed reporting. We further note that the court specifically noted that it was "convinced" of I.G.'s truthfulness and found that her account of the assault and other events was "devoid of embellishment." Viewing the evidence in the light most favorable to the State, we cannot conclude that no rational fact finder could have found that the elements of the charged offenses were proved beyond a reasonable doubt. I.G.'s testimony sufficiently detailed defendant's assault and, notwithstanding minor inconsistencies or ambiguities, there was nothing inherently incredible in her version of the events. We further conclude that the court did not err in assessing defendant's credibility. As Judge DiMarzio noted, defendant claimed no strong emotional reaction when he learned that Matamoros discovered I.G. in bed with a boy. The court's finding that this testimony was incredible was not erroneous given the evidence that defendant hit I.G. on a prior occasion for having only a photograph of a boy. Defendant conceded that he did so, and both Melesia and Marcella testified that they observed defendant hit I.G. Finally, DeJesus, the DCFS investigator, testified concerning an indicated report from October 2005 that contained allegations that defendant had slapped I.G. in the face.

¶ 90    In summary, with the exception of count V noted below, we conclude that the evidence

was sufficient to sustain defendant's convictions.

¶ 91                                          D. Count V

¶ 92       Defendant's final argument is that, if this court rejects his third argument (challenging the trial court's credibility findings), the evidence was insufficient to establish that he committed an act of sexual penetration as alleged in count V. For the following reasons, we agree.

¶ 93       In count V, the State alleged that defendant put an object, *i.e.*, a cotton swab, into I.G.'s sex organ. Again, as relevant here, criminal sexual assault occurs when someone:

> "commits an act of sexual penetration with a victim who was under 18 years of age when the act was committed and the accused was a family member." 720 ILCS 5/12–13(a)(3) (West 2006).

¶ 94       "Sexual penetration" is defined as:

> "*any contact*, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, *or any intrusion*, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." (Emphases added.) 720 ILCS 5/12–12(f) (West 2006).

¶ 95       I.G.'s relevant trial testimony concerning the Q-tip was as follows:

> "Q. Okay. What did he do with the Q-tip?
>
> A. He said he wanted to see what contact I had with the sperm, he got some liquid for [*sic*] me and then sperm of [*sic*] him, and he said he was going to take it to the laboratory to analyze it.
>
> Q. Okay. Now, just so we're clear, I'm sorry, he took the Q-tip and he said he got some liquid from you?
>
> A. Yes.
>
> Q. What liquid?
>
> A. Like, I don't know, you know, when you get wet, he grabbed that.
>
> Q. From what part of your body?
>
> A. From my vagina, and then he grabbed some sperm that I had inside with [*sic*] me and he say [*sic*] he wanted to see what effect they have.
>
> * * *
>
> Q. When he took the Q-tip, you said he got some liquid from you, how did he get

-21-

the liquid from you?

A. Getting the Q-tip and he went around my vagina, and then he grabbed his sperm.

Q. Okay. And that was the sperm that was on top of you?

A. Yes."

¶ 96    Defendant argues that the State failed to prove beyond a reasonable doubt that defendant committed the act of sexual penetration alleged in count V, because the evidence did not establish that the Q-tip came in contact with I.G.'s sex organ. He argues that the foregoing testimony reflects that, although I.G. initially testified that defendant used the swab to obtain liquid "from my vagina," upon clarification she stated that the swab went "around my vagina." According to defendant, the clarification left the issue "less definitive" and the testimony that the swab went around I.G.'s vagina was ambiguous and insufficient.

¶ 97    The State concedes that I.G.'s testimony concerning the vaginal liquid was insufficient, but argues that the testimony concerning defendant's sperm was sufficient. The State asserts that I.G.'s testimony reflects that defendant used the swab to remove her vaginal liquid from *around* her vagina *and* defendant's sperm from *inside* her vagina and that this was sufficient to support the inference beyond a reasonable doubt that defendant committed a sexual penetration. The State contends that I.G.'s later testimony that defendant used the Q-tip to get *liquid* from around her vagina did not diminish her testimony that defendant used the swab to penetrate her sex organ to obtain *sperm* for laboratory analysis.

¶ 98    We conclude that the evidence was not sufficient to sustain defendant's conviction on count V. I.G.'s testimony concerning the swab's contact with defendant's sperm (and not the vaginal liquid) was, first, that defendant retrieved the sperm from "inside" her vagina and, second, "on top of" her. The testimony that there was sperm "on top of" her was presumably a reference to her earlier testimony on direct examination that defendant ejaculated on her pubic hair and her testimony on cross-examination (addressing why she believed she did not become pregnant after the assault) that defendant did not ejaculate inside of her. It is clear from I.G.'s testimony that defendant's sperm was located only outside her vagina; therefore, the swabbing of defendant's sperm did not involve a vaginal penetration. Viewing the evidence in the light most favorable to the State, we conclude that no rational fact finder could have found beyond a reasonable doubt a sexual penetration. See 720 ILCS 5/12–12(f) (West 2006) (a contact between the sex organ of one person and an object of another or the intrusion of an object into the sex organ of another). Accordingly, we reverse defendant's conviction on count V.

¶ 99    Under Illinois Supreme Court Rule 615(b)(4), we modify defendant's sentence to subtract the four-year sentence the court imposed for the conviction on count V. Therefore, defendant's total sentence is modified from 19 years' to 15 years' imprisonment.

¶ 100                                    III. CONCLUSION

¶ 101     For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed in part and reversed in part and the sentence is modified.

¶ 102     Affirmed in part and reversed in part; sentence modified.