THIRD DIVISION
JULY 5, 2006

1-04-2188

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 24301-02 |
| | ) | |
| JERAL HARVEY, | ) | Honorable |
| | ) | Frank Zelezinski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ERICKSON delivered the opinion of the court:

Defendant Jeral Harvey was convicted following a jury trial on one count of first degree murder on an accountability theory (720 ILCS 5/9-1(a)(1) (West 2002)). He was sentenced to 44 years in prison.

On appeal, defendant contends that his conviction should be reversed and the cause remanded because (1) the trial court improperly advised defendant of the consequences of rejecting an offer to plead guilty, (2) the trial court improperly permitted the jury to consider prior inconsistent statements from certain witnesses' grand jury testimonies and written statements as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115-10.1 (West 2002)) where the recanting witnesses acknowledged making most of the prior inconsistent statements, (3) the trial court improperly admitted certain hearsay testimonies regarding evidence of defendant's alleged other crimes, (4) the cumulation of the alleged errors denied defendant a fair trial, and (5) the trial court improperly admonished defendant pursuant

to Supreme Court Rule 605(a) (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 605(a), eff. October 1, 2001).

### BACKGROUND

Defendant was indicted with codefendant Damien Venn[1] for the first degree murder of Rodney Dumas. During plea negotiations prior to trial, the State offered defendant a 14-year sentence in return for a plea of guilty to the reduced charge of conspiracy to commit murder and a 15-year concurrent sentence for an unrelated vehicular hijacking charge. After defendant rejected the offer, the State requested that the trial court admonish him about the consequences of rejecting the plea offer. The trial court admonished defendant and the matter proceeded to trial.

On July 6, 2001, defendant was at his sister's house in Country Aire, a subdivision in Markham, Illinois, where an altercation ensued between defendant's niece, Sabrina Aikens, and her boyfriend, Derrick Thomas. Sean Mitchell, Dumas's brother, and Tracy Roberson, Thomas's mother, testified that at approximately 7:45 p.m., Thomas was arguing with Aikens when defendant approached Thomas and began arguing with him. Roberson heard Thomas accuse defendant of breaking into his house on an earlier occasion. Mitchell stated that he tried to stop the argument by pulling Thomas away and taking him across the street. Thereafter, Venn came outside and began yelling that "he was tired of this [and he was] going to kill somebody." Mitchell testified that when he, Dumas, and Thomas confronted Venn, Venn pointed a gun towards them and fired but missed.

---

[1]Venn was tried separately from defendant and is not a party to this appeal.

Thereafter, defendant and Venn ran away.

Tomika Stewart, Venn's girlfriend, testified that on July 6, 2001, she went to Country Aire with defendant and Venn. While defendant and Venn went to meet their friends, she visited her mother. She later received a telephone call from defendant and went to pick him up. He told her about the altercation he had with Thomas, Mitchell, and Dumas. Shortly thereafter, she picked up Venn and he told her that Thomas, Mitchell, and Dumas were about to "jump" him so he pulled out a gun and fired in the air. On July 7, 2001, the next day, at approximately 10:30 p.m., Venn, defendant, defendant's girlfriend, Natassaja Hall, and Stewart went to the house of Stewart's mother in Country Aire. After Venn made a telephone call, he and defendant left. At that time, Stewart and Hall also left to get sandwiches. On their way back to Country Aire, Stewart received a telephone call from defendant. Defendant said that Dumas was dead and asked her to come pick him up on Birch Street. When he got into the car, he looked sweaty and out of breath. She stated that he never admitted to shooting Dumas. As she began driving away, she heard Venn call out her name. She stopped the car and he got in. She then dropped defendant and Venn off at a convenience store and went back to Country Aire to find out what had happened.

Stewart's testimony at trial differed dramatically from the testimony she gave in front of the grand jury on July 24, 2001, and the written statement she gave to an assistant State's Attorney on July 12, 2001. At trial, the State impeached her several times with her grand jury testimony and her written statement, which was substantially similar to her grand jury testimony. She acknowledged making the following statements in front of the grand jury. During the altercation on the night before the murder, Venn told her that he shot towards Dumas's head. That same night, she heard

defendant and Venn planning to "get them niggers," referring to Thomas, Mitchell, and Dumas. When Stewart picked up defendant on the night of the murder, he admitted to her that he shot Dumas in the head. In addition, she admitted that she returned to the convenience store after the shooting and picked defendant and Venn up and took them to her house.

Stewart claimed that she made up the story contained in her grand jury testimony and written statement because she, while pregnant, was held in jail for over 72 hours and the detective threatened to take her children away. However, she did not remember which portions of her statements were made up. Over defendant's objection, the trial court allowed the State to publish her grand jury testimony and her written statement in their entirety with certain third-party-admission redactions as substantive evidence pursuant to section 115-10.1 of the Code because she testified that she was unsure which portions of her statements were true and which portions were not.

Police officer Samuel Harris testified that on July 9, 2001, two days after Dumas's murder, Mrs. Sales, the mother of Dumas's girlfriend, told him that a voice-mail message possibly connected to the murder may have been inadvertently left on her home answering machine. Harris transcribed the message without making any alterations.

Stewart verified at trial that the message was a recording of a conversation she had with defendant in the car after the shooting. Apparently, defendant accidentally called someone on his cellular telephone while he was in the car, leaving a voice-mail message on that person's answering machine. She reviewed the transcript at trial and acknowledged that the tape was an accurate recording of their conversation. After making a few corrections, the transcript of the message was published to the jury. During the recorded conversation, defendant said "[Dumas is] about to go to

the hospital, if he ain't dead." Defendant also said that he found Dumas at "[Princeton's] across [sic] cross the street from his crib, going out critical."

Hall testified that on July 7, 2001, she went to the house of Stewart's mother in Country Aire with Stewart, Venn, and defendant. After defendant and Venn left the house, Stewart and Hall went to get sandwiches. On their way back to Country Aire, defendant called Stewart. They then went to Birch Street to pick him up. Defendant stated that Dumas may be dead, but he did not say who shot him. She denied that defendant admitted to shooting Dumas. Instead, she testified that defendant said that "Folk shot Folks," apparently referring to Venn. She also denied seeing defendant with a gun.

On July 13, 2001, Hall gave a written statement to an assistant State's Attorney, and, on July 24, 2001, she testified to substantially similar facts before the grand jury. At trial, Hall acknowledged that she gave the following testimony in front of the grand jury. When Stewart picked defendant up after the shooting, he appeared to be sweaty and out of breath. Once defendant got in the car, he searched for his cellular telephone and ejected the bullets from his .25-caliber handgun. Defendant admitted to shooting Dumas in the head then fleeing the scene because his gun jammed. She further acknowledged that when Stewart wanted to leave, defendant told her that "she better not leave [Venn] because [she] [knew] what [would] happen" to her if she did.

Hall claimed that she made up portions of her grand jury and written statement because the detective coerced her, she had been held in jail for over 72 hours, she was pregnant, and she was scared. Over defense counsel's objection, the State admitted Hall's written statement and grand jury testimony as substantive evidence.

Princeton Harvey (Princeton), defendant's nephew, testified at trial that he met with defendant and Venn on the night of the murder. Princeton denied that defendant telephoned him earlier that day asking him to help defendant find Dumas. Upon finding out Dumas's whereabouts, Princeton headed towards that location with defendant and Venn. Princeton denied that he, defendant, and Venn were "spread out" so they could catch Mitchell, Thomas, and Dumas if they tried to run. Moments later, Princeton saw Dumas outside on the sidewalk. At that time, Venn walked over to Dumas and shot him. Princeton denied that he saw defendant with a gun and that he saw defendant shoot Dumas.

Princeton's trial testimony was substantially different from testimony he gave in front of the grand jury on August 17, 2001. The Stated impeached Princeton numerous times with his grand jury testimony, which was also admitted as substantive evidence over defendant's objection. Princeton acknowledged at trial that he made the following statements at the grand jury hearing. Defendant telephoned him at work on the night of the murder and told him to meet defendant on Birch Street. Shortly thereafter, Princeton met defendant, who was accompanied by Venn. Defendant told Princeton that he was looking for Dumas because he had an altercation with him, Mitchell, and Thomas the night before and they had chased Princeton's younger brother with a gun earlier that day. Princeton said that he was friends with Dumas, Mitchell, and Thomas and that he went along with defendant and Venn to calm them down because they were "rowdy" and drunk. Defendant, armed with a .25-caliber handgun, and Venn, armed with a .38-caliber handgun, stopped cars in the street by waiving their guns at the drivers and asking them for Dumas's whereabouts until eventually they came across Dumas's girlfriend, Tekia Sales. She telephoned Dumas, who was at the home of his

neighbor, an individual named Tone. Defendant, Venn, and Princeton proceeded to walk over to Tone's house. Defendant, holding his gun in his hand, approached Dumas, who was unarmed standing outside on the sidewalk. After defendant began talking to Dumas, defendant put the gun in his pocket. Thereafter, Venn walked over to Dumas, an argument ensued and Princeton heard two gunshots. Venn shot Dumas, who turned around and tried to run but fell in the street. Venn then walked over to Dumas and fired three more shots. When Dumas tried to run towards his house again, defendant shot him in the back. Princeton claimed at trial that he implicated defendant because the detective coerced him.

Jasmine Buckley, Dumas's neighbor, testified that on July 7, 2001, she was at home when she heard what sounded like a firecracker. When she went outside, she saw two male "figures," one shorter than the other, and a person lying on the ground. She stated that the shorter man was firing a gun. As she went into the house to tell her mother to call the police, she saw the taller man running towards Heather Drive. While inside the house, she heard two more gunshots. She then went outside to help Dumas and saw the shorter man fleeing the scene. She said that the shorter man was wearing a red hat, a red shirt, and black shorts. She denied telling the detective that she identified the shorter man as Venn, that she saw a man in a black shirt and a man in a red shirt standing over Dumas, and that Dumas ran towards his house while the man in the black shirt ran towards Roesner Drive.

Jeremy Davis testified that on July 7, 2001, at approximately 11 p.m., he was on Cherry Lane and Roesner Drive when he heard several gunshots. The gunshots appeared to be coming from Dumas's house. Davis stated that he began walking home when he saw defendant running through

the backyard towards Birch Street while talking on his cellular telephone, stating "[w]e just killed [Dumas,] we just killed [Dumas,] come pick me up on Birch [Street]."

Markham police officer Tyrone O'Neal testified that he was on patrol duty on the night of the murder. At approximately 11 p.m., he heard several gunshots and received a dispatch radio call directing him to Roesner and Heather Drive. As he proceeded down Heather Drive, he saw defendant running out of a yard near the 3300 block of Heather Drive.

Marla Travis, Dumas's mother, testified that on July 7, 2001, at approximately 10:45p.m., she heard gunshots outside of her house. Shortly thereafter, her door bell rang. When she looked out of her window, she saw Dumas with wounds in his back standing in front of the door. She took him to the hospital where he later died.

On August 21, 2001, defendant was arrested and questioned about Dumas's murder. Defendant signed a consent form and gave a videotaped statement about the murder. He stated that on July 6, 2001, the night before the murder, he had an altercation with Thomas. After Thomas, Mitchell, and Dumas tried to "jump" Venn, Venn fired a gun at them. On July 7, 2001, defendant spoke with Princeton about an incident where Dumas, Thomas, and Mitchell chased Princeton's younger brother. Later that night, defendant met with Venn on Birch Street and then with Princeton on Roesner Drive. Defendant was armed with a .25-caliber handgun and Venn was armed with a .38-caliber handgun. As they were walking down Roesner Drive, defendant said that he saw Dumas walking out of Tone's house. Defendant crossed the street to talk to Dumas because he wanted to "fight" him. At that time, the handgun was in his pocket. While defendant and Dumas were talking, he heard a gunshot. When Dumas tried to get up and run away, Venn shot him again. Defendant

8

fled the scene after he saw Dumas fall to the ground. He heard four more gunshots while he was running. He ran through two houses and got into Stewart's car on Birch Street. Once in the car, he took the clip out of his gun and emptied the bullets. Stewart then picked up Venn on Willow Lane and all four of them went to Stewart's house. Defendant stated that he was not under the influence of any alcohol or drugs when he gave the statement and the police treated him well while he was in custody.

Dumas died as a result of multiple gunshot wounds. No bullets were recovered from the body, but three .38-caliber spent bullets were found at the crime scene. Forensic scientist Angela Horn opined that all of the bullets were fired from the same gun.

The parties stipulated that a forensic scientist concluded the fingerprints on the cellular telephone battery recovered at 3318 Roesner Drive matched those of Dumas. Following the stipulation, the State rested. Defendant made a motion for a directed finding, which the trial court denied.

Defense expert witness James Reames testified that he examined the tape of defendant's conversation recorded on Mrs. Sales's answering machine and determined that the tape had three unexplained "stop/restart" marks. He opined that the "stop/restart" marks indicated that the tape had been edited. He further testified that he prepared a transcript of the contents of the tape. When the State played the recorded message at trial, Reames's transcript did not match the conversation recorded on the tape. On cross-examination, Reames admitted that he was not a speech expert and that people interpreting recordings can sometimes make mistakes.

Prior to deliberation, the trial court did not allow the witnesses' grand jury testimonies and

written statements to be submitted to the jury. Following closing arguments, the jury returned a verdict finding defendant guilty of first degree murder. The trial court sentenced him to 44 years in prison. Defendant filed a motion to reconsider his sentence, which the trial court denied. Defendant now appeals.

## ANALYSIS

Defendant first contends that the trial court erroneously advised him that conspiracy to commit murder was a lesser-included offense of first degree murder after he rejected the State's plea offer, thereby indicating that he could be convicted of conspiracy to commit murder instead of first degree murder. Defendant argues that the case should be reversed and remanded to determine whether, absent the erroneous information, he would have accepted the offer.

Defendant concedes that his failure to object at trial and include this issue in his posttrial motion has caused it to be forfeited for purposes of appeal (People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988); People v. Allen, 344 Ill. App. 3d 949, 954, 801 N.E.2d 1115 (2003)), but requests that this court review the issue under the plain error doctrine. A reviewing court may invoke the plain error doctrine and review alleged errors not properly preserved when (1) the evidence is closely balanced or (2) the error is so fundamental that the defendant is denied the right to a fair trial. People v. Herron, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467 (2005) (Herron). As this matter bears on defendant's right to a fair trial, this issue will be reviewed as plain error. See People v. Curry, 178 Ill. 2d 509, 528, 687 N.E.2d 877 (1997) (Curry). We therefore address the merits of defendant's contention.

At trial, the assistant State's Attorney asked the court to give defendant a "Curry

admonishment" after defendant rejected the State's plea offer. The trial court informed defendant that he was charged with first degree murder, for which he could receive a prison sentence of between 20 to 60 years. The court explained that in exchange for a plea of guilty, the State was offering a 14-year sentence for "a lesser-included charge of conspiracy to commit murder," which would no longer be available to defendant once it was withdrawn. At this time, defendant stated that he understood the consequences of rejecting the offer and confirmed his decision to reject it.

A criminal defendant has a constitutional right to be reasonably informed of the direct consequences of accepting or rejecting a plea offer. Curry, 178 Ill. 2d at 528. A defense attorney has the obligation to inform his client about the maximum and minimum sentences that can be imposed for the offenses for which the defendant is charged. Curry, 178 Ill. 2d at 528. Pursuant to Supreme Court Rule 402, the trial court must inform the defendant of "the nature of the charge" and "the minimum and maximum sentence prescribed by law" before accepting a guilty plea. 177 Ill. 2d Rs. 402(a)(1), (a)(2). However, the trial court is under no duty to inform the defendant if he has not pled guilty. People v. Jones, 174 Ill. App. 3d 794, 798, 529 N.E.2d 66 (1988).

In Curry, due to the unique factual circumstances presented in that case, our supreme court found that defense counsel was ineffective for erroneously advising the defendant about the consequences of rejecting a plea offer. Curry, 178 Ill. 2d at 536. The defendant in that case was charged with two counts of criminal sexual assault and one count of residential burglary. Curry, 178 Ill. 2d at 515. The State offered to dismiss the residential burglary charge and one of the criminal sexual assault charges and recommend a sentence of 4½ years' imprisonment if he would agree to plead guilty to one count of criminal sexual assault. Curry, 178 Ill. 2d at 516. Unaware that

11

consecutive sentencing would be mandated, defense counsel informed the defendant that even if he was convicted of any of the three charges, he would only receive a sentence close to four years' imprisonment. Based on this information, the defendant rejected the plea offer and proceeded to trial. He was convicted of all three counts and sentenced to a mandatory 12-year prison term. Curry, 178 Ill. 2d at 516. Our supreme court held that the record, which included defense counsel's affidavit admitting his erroneous advice and reflected the defendant's reliance upon it, supported the defendant's contention that but for counsel's erroneous advice, he would have accepted the State's offer, and found defense counsel ineffective. Curry, 178 Ill. 2d at 536.

In this case, although the trial court and the State characterized the admonishment as a "Curry admonishment," Curry is clearly distinguishable. First, defendant has not raised the issue of ineffective assistance of counsel. Second, contrary to defendant's assertion that but for the trial court's erroneous admonishment he would have taken the State's plea offer, the record indicates that the trial court admonished defendant after he rejected the offer. Thus, the trial court was under no obligation to admonish him. Third, even if the trial court had the obligation to inform defendant, "the fact that the court improperly admonished defendant as to his minimum sentence should not, in and of itself, provide grounds for reversal of the trial court's decision." People v. Davis, 145 Ill. 2d 240, 250, 582 N.E.2d 714 (1991) (Davis). No reversal is required unless real justice has been denied or defendant has been prejudiced by the inadequate admonishment. Davis, 145 Ill. 2d at 250. Here, defendant was admonished after he rejected the State's plea offer. Moreover, defendant was not prejudiced by the trial court's admonishment. The State began the colloquy by stating that "[w]e're offering something that's less than what he's facing." Although the trial court misspoke when it

12

stated that conspiracy to commit murder is a lesser-included offense of murder, it explained to defendant the minimum and the maximum sentences for the charge of first degree murder and that the State's plea offer would no longer be available to him once he rejected it. We find no prejudice has been shown.

II

Defendant next raises several arguments contending that the trial court improperly admitted the grand jury testimonies of Hall, Stewart, and Princeton and the written statements from Hall and Stewart.

A

Defendant contends that the trial court erred by allowing the State to publish to the jury the grand jury testimonies of and the written statements of the witnesses pursuant to section 115-10.1 of the Code because the evidence was cumulative as the recanting witnesses acknowledged at trial to making most of the statements in their grand jury testimonies and written statements. Contrary to defendant's assertion that <u>de novo</u> review applies, a trial court's determination about whether to admit evidence is left to the sound discretion of the trial court. <u>People v. Rojas</u>, 359 Ill. App. 3d 392, 401, 834 N.E.2d 513 (2005).

The State responds that after Hall, Stewart, and Princeton were impeached, their grand jury testimonies were admissible pursuant to paragraph (c)(1) of section 115-10.1 of the Code, while the written statements from Hall and Stewart were admissible under paragraph (c)(2) of that provision.

Section 115-10.1 provides:

> "Admissibility of Prior Inconsistent Statements. In all

criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

 (a) the statement is inconsistent with his testimony at the hearing or trial, and

 (b) the witness is subject to cross-examination concerning the statement, and

 (c) the statement –

  (1) was made under oath at a trial, hearing, or other proceeding, or

  (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

  (A) the statement is proved to have been written or signed by the witness, or

  (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

  (C) the statement is proved to have been accurately recorded by a tape recorder, videotape

recording, or any other similar electronic means of

sound recording.

Nothing in the Section shall render a prior inconsistent

statement inadmissible for purposes of impeachment because such

statement was not recorded or otherwise fails to meet the criteria set

forth herein."  725 ILCS 5/115-10.1 (West 2002).

Initially, we find that the witnesses' grand jury testimonies were properly admitted under

paragraph (c)(1).  First, the recanting witnesses' trial testimonies greatly differed from their grand

jury testimonies.  Second, all three witnesses were available for cross-examination.  Finally, their

grand jury testimonies were given under oath at a judicial proceeding.  Therefore, the witnesses'

grand jury statements were admissible under section 115-10.1.  However, we find that certain

portions of Hall's and Stewart's written statements should not have been admitted under paragraph

(c)(2) of that section.

While the majority of Hall's and Stewart's written statements were admissible, certain

portions of the statements containing defendant's declarations did not meet the personal knowledge

requirement of paragraph (c)(2).  A witness cannot satisfy the personal knowledge requirement by

merely testifying as to what a third party claims to have done.  People v. Morales, 281 Ill. App. 3d

695, 700, 666 N.E.2d 839 (1996).  Rather, the witness must have firsthand knowledge of the facts

underlying the third party's declarations.  People v. Wilson, 302 Ill. App. 3d 499, 508, 706 N.E.2d

1026 (1998) (Wilson).  As to the claim that Hall and Stewart were induced to give false statements, "

'once the court is persuaded by a preponderance of the evidence that the prior statement[s] [were] in

fact written or signed by the witness[es], it need make no determination of any other facts relating to the statement[s], for evaluation of the circumstances surrounding the making of the statement[s] is left to the jury.' " Wilson, 302 Ill. App. 3d at 508, quoting M. Graham, Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of the Federal Rules of Evidence 801(d)(1)(a), 613 and 617, 75 Mich L. Rev. 1565, 1592 (1977).

In this case, the majority of both Hall's and Stewart's written statements consisted of events that occurred on July 7, 2001, of which they had firsthand knowledge. However, portions of the written statements, including those which contain defendant's declarations that he shot Dumas and that he fled the scene because his gun jammed, were inadmissible because neither Hall nor Stewart had personal knowledge of that event. As such, the evidence should not have been admitted as substantive evidence. However, the error was harmless. Allowing inadmissible evidence can be held to be harmless error if " 'the alleged erroneously admitted evidence did not prove an element of the crime not established by other properly admitted evidence.' " People v. Jenkins, 209 Ill. App. 3d 249, 257, 568 N.E.2d 122 (1991), quoting People v. Bundy, 79 Ill. App. 3d 127, 134, 398 N.E.2d 345 (1979). In this case, the admission of defendant's statements constituted harmless error because the jury was permitted to consider substantively virtually identical evidence contained in the recanting witnesses' grand jury testimonies.

Defendant's contention that the evidence was cumulative fares no better because the evidence was introduced to serve two distinct purposes. The prior inconsistent statements were admitted to impeach the witnesses' credibility at trial (see 735 ILCS 5/2-1102 (West 2002)), and to assert the

truth of the matter of the contents that were submitted (see 725 ILCS 5/115-10.1 (West 2002)). Thus, we find that reversal is unwarranted.

B

Defendant also argues that the trial court erred by failing to limit the admission of the recanting witnesses' prior inconsistent statements to only those portions which were truly inconsistent.

As stated above, it is within the sound discretion of the trial court to determine whether or not a witness's testimony is admissible under section 115-10.1 of the Code. People v. Lee, 335 Ill. App. 3d 659, 669, 781 N.E.2d 310 (2002). Although only the inconsistent portions of a prior statement are admissible, a trial court need not make a "quantitative or mathematical analysis" of whether a witness's entire statement is inconsistent under section 115-10.1 for the entire statement to be admissible. People v. Govea, 299 Ill. App. 3d 76, 87, 701 N.E.2d 76 (1998), citing People v. Salazar, 126 Ill. 2d 424, 456-58, 535 N.E.2d 766 (1988).

In this case, Stewart's testimony at trial varied greatly from her grand jury testimony and written statement. At trial, she denied that defendant and Venn were planning to "get them niggers," referring to Thomas, Mitchell, and Dumas on the night before the murder, that defendant admitted shooting Dumas, and that she drove defendant and Venn to her apartment after the shooting. Stewart claimed that she was coerced into making her statement, but she could not remember which portions of her grand jury testimony and written statement were true. Based on this testimony, the trial court did not limit the admission of her grand jury testimony and written statement to only those portions that were truly inconsistent because it could not decipher which portions of her statements

were true and which portions were not.

At trial, Hall was impeached after denying that defendant admitted to shooting Dumas in the head, that he emptied his bullets in the car, that he explained to Venn the reason he fled the scene was because his gun jammed after he shot Dumas, and that he told Stewart not to leave Venn because she knew what would happen to her if she did. Hall also claimed that the detective coerced her to implicate defendant.

Princeton's trial testimony substantially deviated from his grand jury testimony. At trial, Princeton denied that defendant called him at work and told him to meet defendant on Birch Street on the night of the murder, that defendant and Venn were "rowdy" and drunk, that defendant, Venn, and Princeton were "spread out" when they walked towards Tone's house, that defendant was armed with a .25-caliber handgun, and that he saw defendant shoot Dumas. After Princeton was impeached, he acknowledged making most of these statements, except that the three of them were "spread out" when they walked to Tone's house. He claimed that he made up those statements because he was coerced by the police.

We find that the trial testimonies of the witnesses were contrary to their grand jury testimonies and written statements. As such, their credibility was diminished significantly and the trial court did not abuse its discretion in refusing to decipher which portions of the recanting witnesses' statements were true and which portions were not.

C

Defendant next argues that the trial court erred in admitting the witnesses' grand jury testimonies in addition to the written statements. He argues that the grand jury testimonies of the

two witnesses themselves were consistent with their written statements and therefore they were inadmissible prior consistent statements. Defendant's claim is without merit as inconsistency for the purposes of section 115-10.1 of the Code refers to a contradiction between a witness's prior statement and that witness's in-court testimony. People v. Thomas, 354 Ill. App. 3d 868, 884, 821 N.E.2d 628 (2004).

III

Defendant next contends that his case should be reversed and the cause remanded because he was prejudiced by the admission of hearsay evidence indicating that he committed other crimes. Specifically, defendant claims that (1) Roberson's testimony that she heard Thomas accusing defendant of having broken into his house during an altercation was inadmissible hearsay asserted to prove that defendant "committed the prior crime of burglary," (2) Stewart's statement that defendant wanted to retaliate against Thomas and Mitchell constituted hearsay to prove conspiracy to commit battery, and (3) Hall's testimony that defendant warned Stewart that she had better wait for Venn constituted assault. Defendant argues this contention should be reviewed for plain error because the evidence is closely balanced.

We find that defendant has forfeited the issue for purposes of this appeal and that plain error review is not warranted as the evidence is not closely balanced and the matter does not deprive defendant of fundamental fairness. Herron, 215 Ill. 2d at 178-79. Contrary to defendant's assertion, the evidence in this case was overwhelming. Defendant's videotaped statement, testimony from Davis, the voice-mail tape recovered from Mrs. Sales's answering machine, and properly admitted grand jury statements all indicate defendant was accountable for Dumas's murder. Therefore,

defendant has forfeited this contention for review.

IV

Defendant next contends that should this court find that a remand for a new trial is not warranted based on the above arguments, it should find that he was denied a fair trial by the cumulative effect of the trial court's admission of the prior inconsistent statements and evidence of other crimes. In light of our findings above, we find that defendant's argument lacks merit.

V

Finally, defendant contends that his case should be remanded for proper admonishments pursuant to Supreme Court Rule 605(a). However, as defendant has not raised a sentencing issue on appeal, remand is unnecessary. People v. Henderson, 217 Ill. 2d 449, 470, 841 N.E.2d 872 (2005).

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

HOFFMAN, P.J., and THEIS, J., concur.