2023 IL App (1st) 220421-U

No. 1-22-0421

Order filed October 27, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 22105 |
| | ) | |
| CHAVIZ WOFFORD, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mitchell and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's order summarily dismissing defendant's postconviction petition is affirmed where he failed to state an arguable claim of ineffective assistance of counsel.

¶ 2    Defendant Chaviz Wofford appeals from the summary dismissal of his *pro se* petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, defendant contends that his petition raised an arguable claim that his trial counsel was ineffective for failing to explain to him the consequences of accepting and rejecting a

plea offer made by the State, and instead, merely relayed the number of years offered. For the reasons that follow, we affirm.

¶ 3    Following a 2007 bench trial, defendant was convicted of first degree murder and sentenced to 47 years in prison. We affirmed on direct appeal and ordered correction of the mittimus. *People v. Wofford*, No. 1-07-1857 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 4    Defendant's conviction arose from the shooting death of 16-year-old Brandon Spivey on August 15, 2004. Following arrest, defendant was charged by indictment with six counts of first degree murder, four counts of aggravated unlawful use of a weapon, and two counts of unlawful use of a weapon by a felon.

¶ 5    On November 29, 2005, at a point in pretrial proceedings during which defendant was representing himself, the State filed a memorandum, titled "Notice to Defendant of Potential Sentencing Range for Each Count of the Indictment," which was tendered to defendant in court. Defendant confirmed at that time that he had received a copy of the indictment as well. The memorandum identified the following sentencing ranges: for counts I and II, which charged first degree murder, 20 to 60 years; for counts III and IV, which charged first degree murder, 40 to 60 years; for counts V and VI, which charged first degree murder, 45 years to life, without the possibility of parole; and for counts VII through XII, which the memorandum stated charged "unlawful possession of a firearm," probation to 7 years.

¶ 6    On December 16, 2005, the trial court asked defendant whether he had read the memorandum. After defendant answered that he had, the court read it aloud into the record. The court then asked defendant, among other things, whether he understood the charges and the

minimum and maximum penalties for the charged crimes. Defendant confirmed that he understood. The Public Defender was appointed to represent defendant later that month.

¶ 7      On March 2, 2006, defendant filed a *pro se* motion for the appointment of counsel other than the Public Defender, alleging that counsel had not established a "meaningful" line of communication with him, had not provided a detailed, written report of his investigation, and had refused to file necessary pretrial motions. Defendant attached a copy of a letter he sent to counsel, stating, among other things, "[T]he Office of Public Defender has an obligation which requires Public Defenders as first order of business to effect the least possible sentence possible through PLEA BARGAINING." A half-sheet entry reflects that defendant withdrew his motion on April 20, 2006.

¶ 8      On January 24, 2007, defendant filed a second *pro se* motion for the appointment of counsel other than the Public Defender. Defendant again asserted that counsel had refused to file necessary pretrial motions, had not provided him a written investigation report, and had not kept him reasonably informed about the case. Defendant withdrew the motion on February 5, 2007.

¶ 9      Defendant's bench trial commenced on February 5, 2007, and concluded on February 26, 2007. Prior to calling its first witness, the State nol-prossed all counts save counts V and VI, both of which charged first degree murder.

¶ 10     Marquita Brown, Spivey's older sister, testified that around 2:30 p.m. on the date in question, defendant, with whom she had a child, entered the home where she and Spivey lived and said someone had been smoking marijuana in his car, a white Ford Focus. He had a "mad look on his face," led her outside, and showed her a "weed blunt" in the car's cup holder. He then said,

"[When] I see your brother, I'm going to beat his ass." Defendant drove away, and Brown did not see him again that day.

¶ 11   Andy Lee Ellis testified that around 9 or 9:30 a.m. on the day in question, he and Spivey smoked a blunt, which he explained was marijuana rolled up in a cigar, in a white Ford Focus that was parked outside Spivey's home. Ellis and Spivey parted ways until about 9 p.m., when Ellis saw Spivey on a bicycle. They rode the bicycle together, with one of them standing on the "stunt nuts," until Ellis heard the chain make a clinking noise.

¶ 12   When Ellis looked down to fix the chain, he heard Spivey say, "What the f***?" Ellis turned and saw a man standing "a couple of inches behind" them, pointing a gun. The man fired one shot. Ellis and Spivey jumped off the bicycle and ran. Spivey called out to Ellis that he was hit and, shortly thereafter, said, "I'm gone" and fell to the ground. Ellis ran to a nearby house and banged on the window. When he heard footsteps coming from around the side of the house, he laid down on the porch. From there, he saw the shooter get into the white Ford Focus and drive away.

¶ 13   Ellis testified that he did not have a gun that night, Spivey did not show him a gun, and Spivey had nothing in his hands when the shooter fired. The next day, Ellis viewed a lineup, in which he recognized defendant as Brown's boyfriend. He told the police that defendant was wearing the same clothing and was the same size and weight as the shooter.

¶ 14   Kenneth Green testified that around 2 p.m. on the day in question, he and Spivey smoked marijuana together in a white Ford Focus that was parked near Spivey's home. Later, around 8:50 p.m., Green was with Ellis when he saw Spivey riding a bicycle. Ellis got on the bicycle with Spivey and they started riding down the street. When Green saw the bicycle's chain slip, Spivey

dismounted to try to fix it. At this point, Green saw a man "come from behind" Spivey. Neither Spivey nor Ellis was facing the man or had anything in his hands. Green heard one gunshot and then saw Spivey, Ellis, and the shooter run from the scene.

¶ 15    Dominique Walters, who was 13 years old at the time of the shooting, testified that around 9 p.m. on the day in question, she was outside with a group that included Spivey and Ellis, smoking marijuana. Spivey and Ellis left on a bicycle to go to a nearby store. When they got to the corner, they stopped riding and Ellis dismounted from the bicycle. At that point, "two men ran up on them and then they shot." Specifically, Walters explained that the taller of the two men was "[j]ust standing," while the shorter of the two men pointed a gun toward Spivey. She heard the gun go off and then saw Spivey, Ellis, and the two men all run from the scene.

¶ 16    Walters testified that she saw the shooter's face and recognized him as the father of Spivey's sister's child. At the time, she did not know his name, but she knew he owned a white Ford Focus in which she had previously smoked marijuana with Spivey. Later that night, she identified defendant as the shooter in a photo array. She also identified defendant in court.

¶ 17    Kelly Holliday testified that around 10:30 a.m. on the day in question, she was walking to the home of her boyfriend, Roosevelt Canady, when Canady and defendant drove up in defendant's car, a white Ford Focus. The group "went riding" and stayed together until about 2:30 p.m., when defendant left to "go see [his] girl."

¶ 18    Holliday next saw defendant around 11:30 p.m. She was outside with Canady when defendant pulled up in his car and said, "Man, I got myself into some shit." Defendant told Canady that he needed to talk with him, and Holliday heard him "saying something that he had just popped somebody." Holliday and Canady entered the car and the group drove around. While they were

driving, Holliday heard defendant say he had found Spivey and some of his friends smoking marijuana in his car, his pride was all he had, and he was not going to let anyone take it from him. He related that he had pulled up to a location, exited his car, and shot Spivey, who was on a bicycle or fixing a chain. According to Holliday, defendant said he shot Spivey because he had caught him smoking marijuana in his car. He said, "If I had the chance, I would pop Shorty again, but I didn't, because there was too many witnesses out." Defendant also said that when he got "his check," the first thing he was going to do was get on a plane to California. Around 3:30 a.m., the group was stopped by the police.

¶ 19    Roosevelt Canady III testified that during the morning of the day in question he and defendant "hung out." That night, he was "chilling" with Holliday when defendant drove up in his white Ford and said he wanted to "holler at [Canady] a little later over there." Defendant then drove Canady and Holliday to a liquor store. He stated, "I'm not for sure exactly which store we went to, but we went to the store, we was playing the music and that's basically all I remember." Canady testified that he had been drinking all day and smoking marijuana and "[e]verything else was a blur." He woke up the next morning handcuffed to a pole at a police station.

¶ 20    Chicago police detective Robert Smith testified that when he stopped defendant's car around 3:30 a.m., Canady did not show any signs of intoxication.

¶ 21    Two separate assistant state's attorneys testified that during their interviews with Canady after the shooting, Canady did not appear to be under the influence of alcohol. One of the assistant state's attorneys also testified that defendant told him he had "popped" Spivey because he was angry with Spivey for smoking marijuana in his car.

¶ 22    The State entered a stipulation to the testimony of the medical examiner who performed Spivey's autopsy that Spivey died as a result of a single gunshot wound to the right upper back.

¶ 23    Defendant made a motion for a directed finding, which the trial court denied.

¶ 24    Defendant testified on his own behalf that one night in March 2004, he was walking through an alley near Brown and Spivey's house when he encountered Spivey at the entrance to a gangway. Spivey pulled out a gun and pointed it at defendant. Defendant held up his hands, at which point Spivey said, "Oh, that's you," and told defendant Brown was inside the house. When asked whether anything else happened "with that incident," defendant stated that Spivey "just kept on bragging about how he had a gun."

¶ 25    Defendant testified that on the morning of August 15, 2004, he and Canady went to a liquor store in defendant's white Ford Focus. They then picked Holliday up and the three went "riding around" and visiting people until around 4 or 4:30 p.m. Defendant had a gun on his person, as he "always" carried a gun due to the large number of shootings and robberies in the area.

¶ 26    Around 5 p.m., he went to Brown and Spivey's house. About two hours later, he went out to his car. When he opened the driver's door, marijuana smoke came out, which made him "a little upset." He noticed "blunts" in the ashtray and burn marks on the seats. When Brown came outside, he told her someone had been smoking in his car. Defendant left, vacuumed his car, bought minutes for his phone, parked near his cousin's house, and started walking to a nearby restaurant.

¶ 27    As he was walking, he saw Spivey and "some other guy" fixing a bicycle. He "went to go ask" Spivey whether he had been smoking in his car. As defendant approached, Spivey, who was kneeling and whose hand was somewhere around his waist, asked, "What the f*** you want?" and "What you want now, b***?" When defendant replied, "What, b***," Spivey stood up with his

hands close to the waist area of his pants. Defendant thought Spivey was reaching for a gun. Defendant reached for his own gun, fired one shot toward the ground, and ran. He did not know at the time whether his shot hit anything or anyone. He drove around the neighborhood until he spotted Canady and Holliday. He then drove them around from about 10:30 or 11 p.m. until he was pulled over by the police near his house.

¶ 28    On cross-examination, defendant agreed that he was carrying his gun when he encountered Spivey in March 2004. He denied telling Brown on August 15, 2004, that the next time he saw her brother, he was "going to beat his ass." He stated that Spivey was facing him when he fired his gun toward the ground. Defendant explained that about 30 or 40 minutes after the shooting, he threw his gun in a garbage can. He denied saying in Canady's and Holliday's presence that he shot Spivey because he smoked marijuana in his car, but admitted mentioning to them that he had an altercation with Spivey during which he pulled a gun and fired it.

¶ 29    Following arguments, the trial court found defendant guilty of first degree murder, rejecting his claim of self-defense. The trial court set April 5, 2007, for posttrial motions and sentencing.

¶ 30    On March 29, 2007, defendant filed a *pro se* motion for a new trial, asserting ineffective assistance of trial counsel and violations of due process and equal protection. In the motion, defendant alleged that his trial counsel "entered" the affirmative defense of self-defense without his knowledge or approval, which forced him to testify and give self-incriminating statements. He further alleged that counsel failed to conduct a full factual investigation into his case and, therefore, was not prepared to make an informed assessment of the available defenses or to "intelligently discuss the realities of the case" with him. Noting that he had twice filed and withdrawn a "motion

to withdraw counsel," defendant asserted that he wanted counsel to challenge Ellis's, Green's, and Walters's statements, but the motion to quash arrest and suppress evidence that counsel filed was "a sham of pretense only."

¶ 31    Defendant also alleged that counsel failed to: introduce evidence that Brown visited him in jail; attack the autopsy report; attempt to "strike" Ellis's statements; and introduce evidence of police coercion at the time of arrest. Finally, defendant asserted that Canady's statement to the assistant state's attorney should not have been admitted because it was not made under oath and Canady did not remember making it. In an attached "exhibit," defendant stated that he had asked counsel "to negotiate a plea bargain with Mr. Spivey['s] family."

¶ 32    On April 5, 2007, counsel filed a motion for a new trial. The trial court set the posttrial motions and sentencing for May 15, 2007. On that date, defense counsel indicated he had tendered the presentence investigation report to defendant, and defendant stated he had reviewed it. Counsel also informed the court that defendant desired to proceed *pro se*. After confirming with defendant that this was his wish, the court admonished him about proceeding *pro se* on the posttrial motion and at sentencing. Defendant indicated that he believed it was in his best interest to proceed *pro se*. The court allowed counsel to withdraw and set a new date for posttrial motions and sentencing.

¶ 33    On June 8, 2007, defendant filed a *pro se* amended motion for a new trial or, in the alternative, "reconsideration of a lesser offense." In the motion, he repeated his argument regarding his right to remain silent being violated when counsel "entered" the affirmative defense of self-defense. Again noting the motions he filed and withdrew "for withdrawal of counsel," he argued that he was denied the effective assistance of counsel "because of all the complaints against counsel." Defendant further argued that counsel was ineffective for failing to: inform the court he

was "seeking imperfect self-defense, 2nd degree or even involuntary manslaughter"; conduct an investigation of Walters, Ellis, Green, and Holliday, which would have revealed they were high and intoxicated and gave inconsistent statements; attack Walters's credibility and the circumstances of her statement to the police in the motion to quash arrest and suppress evidence; "fully challenge" probable cause; introduce evidence that Brown visited him in jail; introduce evidence of police coercion at the time of arrest; and introduce Holliday's grand jury testimony. He asserted that the trial court erred in allowing Canady's prior inconsistent statements to be admitted as substantive evidence, disregarding the inconsistencies in the testimony of the State's witnesses, and discrediting his own testimony. Finally, defendant asserted that "Counsel was informed to negotiate with strictly with the victim's family in order to try to avoid trial. Instead he talk to the State's in which I did not request him to do."

¶ 34 On June 21, 2007, the trial court held a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), at which defendant indicated he was withdrawing his initial *pro se* posttrial motion and proceeding on the amended motion. Defendant argued that counsel's decision to claim self-defense forced him to testify and incriminate himself. He asserted that he and counsel had a "conflict of interest," as he did not want to proceed on a theory of self-defense but, rather, "wanted to file more motions and do more investigation" regarding identification. Defendant also argued the merits of the other issues raised in his posttrial motion at length. Among other things, defendant stated that counsel failed "to make an assessment defense available to his client or to discuss the reality of the case with his client." He also asserted that an American Bar Association rule of professional conduct provided that "a lawyer must abide by a client decision concerning the representing, while the accused should receive the careful advice of his lawyer before entering a

guilty plea or taking an appeal, waive the jury, and whether client will testify, these decisions must be made by defendant himself."

¶ 35 When asked by the court, defendant agreed that it was his own decision to testify but insisted that he did so because he "was left with no option." The trial court asked defendant whether he had testified truthfully at trial, and defendant answered that he had. Defendant also agreed that, prior to trial, he had told counsel what happened the night of the shooting. In response, the court asked defendant what defense he believed counsel was "left with" after defendant had related to counsel that he had fired the shot that struck Spivey in the back. Defendant answered that there were "constitutional issues," but eventually agreed his only other defense would have been reasonable doubt. The court noted that counsel, in his answer to pretrial discovery, had stated that defendant would be relying upon the State's inability to prove guilt beyond a reasonable doubt and that defendant "may assert the defense of self-defense." The court explained to defendant that by answering in this manner, counsel had preserved the option for defendant to raise self-defense at trial.

¶ 36 After questioning defense counsel, the trial court found that counsel was not "in any way ineffective" and denied defendant's *pro se* motion for a new trial or, in the alternative, reconsideration of a lesser offense.

¶ 37 The case proceeded to sentencing on June 26, 2007. The trial court initially sentenced defendant to 25 years in prison for first degree murder and an additional 25 years in prison for the use of a firearm that caused death, for a total of 50 years' imprisonment. Defendant immediately filed a written *pro se* motion to reconsider sentence, detailing several specific factors in mitigation. He asserted that the proper sentence, considering the facts, evidence, mitigating factors, and the

objective of restoring him to useful citizenship, should be 20 years. After considering defendant's motion, the trial court resentenced him to 22 years in prison for first degree murder, with an additional 25 years for personally discharging a firearm, for a total of 47 years' imprisonment. Defendant filed a timely *pro se* notice of appeal.

¶ 38    On direct appeal, defendant contended that the trial court erred when it considered untrustworthy evidence in aggravation during his sentencing hearing and that his mittimus improperly reflected two convictions where there was only a single victim. We affirmed and ordered correction of the mittimus. *Wofford*, No. 1-07-1857 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 39    On November 30, 2021, defendant filed the *pro se* postconviction petition at issue in the instant appeal, arguing that he received ineffective assistance of trial counsel due to a "lack of communication regarding the plea bargain process." Defendant alleged that on February 5, 2007, the day his bench trial commenced, his appointed counsel informed him "for the 1st and only time" of a plea offer, saying, "[T]he State has offered you a plea deal of 30 years, but you have to take the 30 years right now or go forward with the trial today." Defendant asserted:

"When trial counsel presented this plea offer without any counsel, legal advice, legal recommendations, and without telling [me] the advantages of this plea offer, disadvantages of this plea offer, or the probable outcome of this case at trial, [I] rejected this plea offer. Had [I] been reasonably informed with respect to the direct consequences of accepting and rejecting a plea *** [I] would have accepted this plea offer at this preliminary stage that day and got it to be [a] written formal plea offer that day."

¶ 40 According to defendant, counsel's statement regarding the 30-year offer constituted the "whole conversation on how trial counsel presented this plea offer." He alleged that counsel had not discussed the plea bargaining process with him as being a strategy or a possibility, even when he had asked counsel to negotiate with Spivey's family. He explained that he asked counsel to pursue a plea offer with Spivey's family "for a minimum sentence to avoid trial" because "counsel failed to explain how he was gonna win this self-defense argument when victim got shot in the back" and failed to explain "how [he] was going to overcome Roosevelt Canady and Kelly Holliday statements." Defendant pointed out that the 30 years offered was a 10-year difference from the "20 years minimum [he] was seeking with the victim's family." He alleged that he "would have accepted the 30 years at 100% had [he] had legal counsel, legal advice, and legal recommendations at this critical pretrial stage with all this overwhelming evidence against [him]." Defendant attached his own affidavit, averring that the facts presented in his petition were true and correct to the best of his knowledge and belief.

¶ 41 The circuit court summarily dismissed defendant's petition as frivolous and patently without merit in a written order on February 25, 2022. Defendant filed a timely notice of appeal.

¶ 42 On appeal, defendant contends that his petition raised an arguable claim that trial counsel was ineffective where he failed to explain the consequences of accepting or rejecting the State's plea offer and, instead, merely relayed the number of years offered.

¶ 43 In cases not involving the death penalty, the Act provides a three-stage process for adjudication. 725 ILCS 5/122-1 (West 2020); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The instant case involves the first stage of the process, during which the trial court independently assesses the petition, taking the allegations as true. *Hodges*, 234 Ill. 2d at 10. Based on this review, the trial

court must determine whether the petition "is frivolous or is patently without merit," and, if it so finds, dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2020).

¶ 44    A petition may be dismissed as frivolous or patently without merit "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition has no arguable basis in law when it is founded in "an indisputably meritless legal theory," for example, a legal theory that is completely belied by the record. *Id.* A petition has no arguable basis in fact when it is based on a "fanciful factual allegation," which includes allegations that are "fantastic or delusional" or contradicted by the record. *Id.* at 16-17; *People v. Morris*, 236 Ill. 2d 345, 354 (2010). Our review of a first-stage dismissal is *de novo*. *Hodges*, 234 Ill. 2d at 9. Pursuant to this standard, we review the trial court's judgment, not the reasons given for it. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 45    Traditionally, to establish ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) but for counsel's errors, there is a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, our supreme court has indicated that in the context of first-stage postconviction proceedings, a defendant need not conclusively establish these factors; in *Hodges*, our supreme court held that "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 46    In this court, defendant contends that his petition should not have been summarily dismissed where it raised an arguable claim that trial counsel was ineffective for failing to explain

the consequences of accepting or rejecting the 30-year plea offer made by the State. He asserts that counsel's performance arguably fell below an objective standard of reasonableness because counsel's single, cursory sentence stating the number of years offered did not (1) identify to which offense defendant was to plead guilty; (2) explain that, if he were found guilty of first degree murder after trial, he faced a sentencing range which was, at minimum, 15 years greater than the 30-year offer; or (3) impart any advice regarding trial, including whether a strong defense existed or whether the evidence of guilt was overwhelming.

¶ 47　　As for prejudice, defendant maintains that he has shown arguable prejudice where he would have accepted the plea had he been properly advised. As corroborating evidence of this claim, he argues that (1) he was facing, at minimum, 45 years in prison if found guilty of first degree murder at trial, but was offered 30 years; (2) he had not wanted to claim self-defense, as he knew it was not a strong defense; and (3) he had wanted to negotiate a plea with Spivey's family, thus showing his willingness to enter a plea.

¶ 48　　Although a defendant has no constitutional right to plea bargain, if the State decides to do so, the defendant has the right to the effective assistance of counsel during those negotiations. *People v. Hale*, 2013 IL 113140, ¶ 16. This right to the effective assistance of counsel extends to the decision to reject a plea offer, even if the defendant subsequently receives a fair trial. *Id.* It is well-settled that a defendant has the constitutional right to be "reasonably informed" with respect to the direct consequences of accepting or rejecting a plea offer. *Id.* Under a correlative principle, a defense attorney must inform his or her client about the maximum and minimum sentences that can be imposed upon a conviction at trial. *People v. Harvey*, 366 Ill. App. 3d 910, 918 (2006). An attorney should also "candidly advise the accused concerning all aspects of the case, including a

candid estimate of the probable outcome." *People v. Blommaert*, 237 Ill. App. 3d 811, 817 (1992) (citing *ABA Standards for Criminal Justice*, 4-5.1(a)); see also *Estremera v. United States*, 724 F.3d 773, 778 (7th Cir. 2013) (noting with approval the parties' assumption "that counsel's obligation entails explaining the material terms of the prosecutor's offer").

¶ 49 To show prejudice in the context of a plea bargain, our supreme court has held that a defendant must show a reasonable probability that (1) but for counsel's deficient advice, he would have accepted the plea offer, (2) the plea would have been entered without the prosecution cancelling it, (3) the trial court would have accepted the bargain, and (4) " 'the end result of the criminal process would have been more favorable by reason of the plea.' " *Hale*, 2013 IL 113140, ¶ 19 (quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012)).

¶ 50 A defendant's showing of prejudice must encompass more than his own self-serving statements. *Id.* ¶ 18. Rather, there must be objective confirmation that the defendant's rejection of the plea offer was based on counsel's erroneous advice, and not on other considerations. *Id.* Among other things, the disparity between the sentence a defendant faced and a significantly shorter plea offer can be considered in support of a defendant's claim that he would have accepted a plea offer. *Id.*

¶ 51 A defendant must establish both that counsel's performance was deficient and that prejudice resulted from that alleged deficiency. *People v. Sanchez*, 169 Ill.2d 472, 487 (1996). Thus, we may proceed directly to the prejudice prong without reviewing whether counsel's performance was arguably deficient. *Hale*, 2013 IL 113140, ¶ 17.

¶ 52 Turning to the prejudice prong, we find that defendant has failed to show that he was arguably prejudiced. Defendant does not allege that his trial counsel gave him erroneous advice

on the minimum and maximum sentencing ranges he was facing if he proceeded to trial and was found guilty. Rather, defendant alleges that he would have pled guilty had he been "reasonably informed with respect to the direct consequences of accepting and rejecting a plea" and if he had "had legal counsel, legal advice, and legal recommendations at this critical pretrial stage with all this overwhelming evidence against [him]."

¶ 53    We find that the record rebuts defendant's assertion that had defense counsel properly advised him, he would have accepted the plea offer of 30 years and pled guilty. Rather, the record shows that, at the time defendant rejected the plea, he had knowledge of the sentencing ranges for the offenses with which he was charged, and that his decision to reject the plea offer and proceed to trial was based on other considerations, including that he wanted a lower sentence than the 30 years offered by the State on the day of trial and then decided to proceed to trial to pursue a theory of self-defense.

¶ 54    The record shows that defendant wanted a lower sentence than the State's offer of 30 years, as he alleges in his petition that, "[c]onsidering [he] was asking trial counsel to negotiate with victim's family for a minimum sentence to avoid trial. This plea offer of 30 years was a difference of 10 years from the 20 years minimum [he] was seeking with the victim's family." Further, the record shows that defendant chose to pursue a theory of self-defense at trial. On January 5, 2007, in defendant's answer to pretrial discovery, defense counsel stated that defendant "may assert the defense of self defense." On the day of trial, defendant withdrew his pending motion for appointment of counsel other than the public defender and stated he was ready to proceed to trial with defense counsel as his attorney. In defendant's case, he testified on his own behalf that on one night in March 2004, when he encountered the victim at an entrance to a gangway, the victim

had pulled out a gun and pointed it at him, and after the victim saw that it was defendant and told him the victim's sister was inside, the victim "just kept on bragging about how he had a gun." He testified that on the day of the shooting, he thought the victim was reaching for a gun, after which he reached for his own gun, shot once towards the ground, and ran. In addition, in the other issue raised in defendant's petition regarding whether counsel failed to explain the consequences of "accepting and rejecting a jury trial," he acknowledges he chose to proceed on a theory of self-defense, as he stated that he "chose a bench trial," and that "[s]ince self defense was an option and it's a matter of what constitutes self defense then it should be in front of a judge whose experienced in this area versus non experienced citizens." Thus, the only reasonable inference from this record shows that defendant did not want to accept the State's 30-year plea offer but wanted to pursue his theory of self-defense and to receive a lower sentence than the 30-year plea offer or avoid even the minimum sentence. See *People v. Miller*, 393 Ill. App. 3d 629, 636-37 (2009) (affirming summary dismissal and concluding that the defendant's ineffective assistance of counsel claim failed, noting that the "only reasonable inference" from his rejection of the plea offer of the minimum sentence is he wanted to pursue his claim of self-defense and to "avoid serving even the minimum sentence," and "[h]e lost his gamble").

¶ 55 We note that the record shows that before trial defendant had knowledge of the sentencing ranges for the offenses in which he was charged. On November 29, 2005, at a point in pretrial proceedings when defendant was representing himself, he received in court a memorandum identifying the sentencing ranges for the offenses and then on December 16, 2005, he acknowledged in court that he read the memorandum. Thereafter, the court expressly read the memo regarding the sentencing ranges aloud and then specifically asked defendant if he

understood the minimum and maximum possible penalties, after which defendant acknowledged that he did. Thus, at the time he rejected the plea offer of 30 years, defendant had knowledge of the minimum and maximum sentencing ranges.

¶ 56    In addition, as previously discussed, to show prejudice, defendant must show a reasonable probability that the plea would have been entered without the prosecution cancelling it and the trial court would have accepted it. *Hale*, 2013 IL 113140, ¶¶ 19-20. While defendant generally alleges in his petition that the State would have accepted the plea offer "from a preliminary offer into a formal offer" and the "court would have accepted this plea offer cause it reduce[d] my sentence by 3 years," defendant does not identify any other corroborative facts to support that the State would not have cancelled the alleged offer or that the trial court would have accepted it. See *Hodges,* 234 Ill. 2d at 10 (a petition must set forth facts " 'which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent' ") (quoting *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008)).

¶ 57    Based on this record, we find that defendant has not shown that there is a reasonable probability that he would have accepted the State's plea offer of 30 years had counsel not been deficient. Because defendant cannot show that he was arguably prejudiced, he has not presented an arguable claim for ineffective assistance of counsel. The trial court did not err in summarily dismissing his petition as frivolous as patently without merit.

¶ 58    For the reasons explained above, we affirm the summary dismissal of defendant's postconviction petition.

¶ 59    Affirmed.